**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Paul V. OATES, Defendant-Appellant.**

**No. 1224, Docket 76–1100.**

United States Court of Appeals,
Second Circuit.

Argued July 19, 1976.
Decided June 3, 1977.

Joseph Grano, Detroit, Mich. (Talbot, Grant & McQuarrie, Detroit, Mich., by James Howard Grant, Detroit, Mich., on the brief), for defendant-appellant.

Victor J. Rocco, Asst. U. S. Atty., Brooklyn, N. Y. (David G. Trager, U. S. Atty., E. D. N. Y., Paul B. Bergman, Asst. U. S. Atty., Brooklyn, N. Y., of counsel, on the brief), for plaintiff-appellee.

---

\* Of the Eastern District of New York, sitting by designation.

1. The indictment in this case charged as follows:

### COUNT I

*On or about and between the 26th day and 27th day of April 1972, in the Eastern District of New York, the defendant ISAAC DANIELS and the defendant PAUL V. OATES knowingly and intentionally conspired to possess, with intent to distribute about 485 grams of heroin hydrochloride, a Schedule I narcotic drug controlled substance. (Title 21, United States Code, § 846)*

### COUNT II

On or about the 27th day of April, 1972, in the Eastern District of New York the defendant ISAAC DANIELS aided and abetted by the defendant PAUL V. OATES knowingly and intentionally did possess with intent to' distribute about 485 grams of heroin hydrochloride, a Schedule I narcotic drug controlled substance. (Title 21, United States

Before WATERMAN and MESKILL, Circuit Judges, and BARTELS, District Judge.\*

WATERMAN, Circuit Judge:

This is an appeal from a judgment of the United States District Court for the Eastern District of New York convicting appellant, following a six-day jury trial, of possession of heroin with intent to distribute, and of conspiracy to commit that substantive offense.[1] In seeking reversals of his convictions, appellant urges upon us three unrelated claims of error.

He first contends that the trial court erroneously denied his pretrial motion to suppress. This motion was predicated on a purported lack of probable cause to institute the warrantless search which resulted in the discovery of a white powdery substance, believed to be heroin, on the person of one Isaac Daniels. This discovery produced the immediate arrest not only of Daniels but also of appellant, who appeared to be accompanying Daniels at the time of the warrantless search and seizure. Not unexpectedly, it was the white powdery substance at which the suppression motion was primarily directed.

Appellant's second claim of error is that the trial court incorrectly admitted into evidence at trial the official report and work-

Code, § 841(a)(1) and Title 18, United States Code, § 2)

Both appellant Oates and his codefendant Daniels originally entered pleas of not guilty to both counts of this indictment. On September 12, 1972, the date trial was scheduled to commence, Oates and Daniels both pleaded guilty to the second count of the indictment and each was sentenced to a term of imprisonment. After imposition of sentence, however, appellant moved, but Daniels apparently did not, to withdraw his plea of guilty. Although this motion was unsuccessful, a second motion seeking the same relief, but based on different grounds, was granted, and appellant's judgment of conviction was vacated. Appellant's case was then reassigned for trial. It commenced on January 5, 1976, and resulted in the judgment of conviction from which appellant presently appeals. Daniels was not in any way involved in appellant's trial.

sheet of the chemist who analyzed the substance seized from Daniels. Appellant contends that the introduction of this evidence was impermissible for the evidence was inadmissible hearsay under the new Federal Rules of Evidence, and, also, that under the circumstances of this case, the introduction of the report and the worksheet violated appellant's right under the Sixth Amendment to the United States Constitution to confront the witnesses against him. The final claim of error relates to an alleged infirmity in the trial court's charge on the presumption of innocence.

We conclude that the motion to suppress was properly denied and that appellant's assignment of error in the court's charge, a claim which we do not discuss, is without merit. As to the claim that the chemist's report and worksheet were improperly admitted into evidence, although we discuss the constitutional grounds for this claim, we find it unnecessary to decide the claim on that ground, for we agree with appellant that those documents were inadmissible under the Federal Rules of Evidence. Accordingly, we reverse and remand to the district court for a new trial.

I

We initially consider appellant's claim that the trial court erroneously denied his motion to suppress certain evidence, the principal piece of evidence being the white powdery substance discovered on Daniels' right thigh moments before Daniels and Oates were arrested. The evidence adduced at the suppression hearing and the trial, *see United States v. Fields,* 458 F.2d 1194, 1196 (3d Cir. 1972), *cert. denied,* 412 U.S. 927, 93 S.Ct. 2755, 37 L.Ed.2d 154 (1973), when viewed in the light most favorable to the government, as it must be evaluated on this review of the denial of the motion to suppress, *see United States v. Vital-Padilla,* 500 F.2d 641, 642–43 (9th Cir. 1974); *United States v. Walling,* 486 F.2d 229, 236 (9th Cir. 1973), *cert. denied,* 415 U.S. 923, 94 S.Ct. 1427, 39 L.Ed.2d 479 (1974), reveals the following relevant facts.

The drama logically begins with the introduction of the protagonist, Garfield Hammonds, Jr. As of April 26, 1972, the date the plot begins to unfold, Hammonds was an experienced special agent of the Federal Bureau of Narcotics and Dangerous Drugs ("BNDD"), having served with that organization for nearly three years. For approximately the first two years of his service with BNDD, Agent Hammonds had been assigned to the Detroit office but since July of 1971 he had been stationed in New York City. Agent Hammonds' responsibilities as a special agent included the obtaining, through operations in an undercover capacity, of intelligence concerning persons or organizations engaged in the business of illicit drug trafficking. Initially, this information was gathered in order to identify the unsavory characters engaged in these sordid activities and it was then used to select from among them so-called "targets," presumably for investigation and eventual prosecution. By April of 1972 Agent Hammonds had already participated in approximately twenty arrests for violations of federal narcotics laws. According to Agent Hammonds, often these arrestees were armed with dangerous weapons at the time of their apprehension. Agent Hammonds had also spent six months working undercover in a methadone treatment program for drug addicts. Inasmuch as his activities there involved working eight- and twelve-hour shifts with the participants in the program, Agent Hammonds had become intimately familiar with the physical manifestations of drug addiction and was well-qualified to identify addicts by observation.

Next in our cast of characters is the antagonist, appellant Paul Oates. Although Agent Hammonds had never met or seen Paul Oates in person, his name and face were familiar to Hammonds for, while stationed at the BNDD office in Detroit, Hammonds had seen photographs of Oates, and he knew through information he had received from BNDD intelligence sources, the Detroit local police, and the Wayne County Sheriff's Office, that Oates was reputed to be a major narcotics dealer in the Detroit area. In fact, Hammonds had par-

ticipated in an investigation in which Oates had been a so-called "target." It is thus not surprising that Hammonds' curiosity was aroused when, after giving testimony at a drug trial in Detroit and while waiting for the announcement that American Airlines Flight 440, his return flight to New York City, could be boarded, Hammonds recognized Oates at the Detroit Metropolitan Airport at about 7:00 p. m. on April 26, 1972.

At the time he was initially observed by Agent Hammonds, Oates was seated and engaged in conversation with another man, one Isaac Daniels, whom Agent Hammonds did not recognize. It can be inferred from the testimony that Oates and Daniels were a study in sartorial contrast. While Daniels was described as being shabbily dressed, Oates, on the other hand, was apparently more nattily attired, the most distinctive feature of his clothing being "a yellow hat, a Robin Hood style hat with a green feather." When American Airlines Flight No. 440 to New York was announced Oates and Daniels separated and boarded the aircraft, Oates taking a seat in the first-class section and Daniels occupying a seat in the coach compartment. Agent Hammonds also boarded the plane and moved to the coach section, sitting across the aisle from Daniels at a distance of perhaps five or six feet. During the flight Oates and Daniels did not associate with each other, but Hammonds carefully observed that Daniels exhibited some of the telltale signs of drug addiction, characteristics with which Hammonds had become acquainted through his intimate contact with drug addicts while working in the methadone treatment program. Both of Daniels' hands were swollen and there were discernible needle "track" marks on the back of his right hand. Moreover, Daniels suffered from a constantly running nose. Although Agent Hammonds scrutinized Daniels, he did not notice any unusual bulges in Daniels' clothing. In particular, although he specifically looked at Daniels' legs, Agent Hammonds did not observe anything suspicious about Daniels except the aforementioned manifestations of drug addiction.

After Oates and Daniels deplaned at LaGuardia Airport in New York City, they rejoined, conversed, and then proceeded without luggage, to the exit area where they met a third man. Agent Hammonds' suspicions were further, and understandably, aroused by this latest development because Hammonds knew the third man to be one Willie McMillan, a former government informant whom Agent Hammonds knew "to be associated with the drug culture in New York City." Oates and McMillan exchanged greetings, although there was no similar exchange between McMillan and Daniels. The three men then walked to a nearby telephone booth in the airline terminal. McMillan entered the booth, dialed a number, and handed the receiver to Oates who then entered the booth with McMillan and closed the door behind both of them. Meanwhile, Daniels waited outside the booth. Agent Hammonds decided to truncate the surveillance because he was apprehensive that McMillan, the recently deactivated government informant, might recognize him. He also abandoned any thought of trailing the suspects outside of the airline terminal for he did not have a government vehicle at his disposal. Hammonds inquired as to whether there was a return flight to Detroit that evening and, upon learning that the next flight for Detroit was scheduled for about 8:00 a. m. the next morning, he notified his superiors at BNDD of his observations and received from them authorization to conduct a surveillance of the American Airlines terminal the next morning.

Agent Hammonds and four other BNDD special agents arrived at the terminal shortly after 7:00 a. m. on the morning of April 27. Oates and Daniels were already in the departure lounge, sitting approximately fifteen feet apart despite the fact that there were empty seats in close proximity to the place where Daniels was sitting; indeed, there was an empty seat right next to Daniels. Although they were more or less facing each other, Oates and Daniels neither conversed nor gave any indication that they recognized each other. It appeared, how-

ever, that Oates, whose view of Daniels was unobstructed, was looking at Daniels or, at least, was looking in his direction. At first, Agent Hammonds stood immediately behind Oates and, upon looking at Daniels, noticed a prominent bulge around the area of Daniels' right coat pocket. Hammonds then sat down next to Daniels and noticed another bulge in Daniels' clothing, this one being in the area of the inside of Daniels' right thigh. As stated earlier, Agent Hammonds had not observed either bulge during the flight to New York on the previous evening. Now apprehensive that Daniels might be armed, Hammonds sent a member of his BNDD surveillance team to obtain from airport security personnel the assistance necessary to conduct a weapons search.

In response to Hammonds' request for assistance, two uniformed Customs officers, Customs Security Officers Fromkin and DeAlfi, were dispatched to the departure lounge. After being informed of the BNDD observations of the preceding twelve hours, the Customs officers were warned by Agent Hammonds that he had reason to believe that the suspects Oates and Daniels were armed and were carrying narcotics. Although the Customs officers were not informed of Agent Hammonds' intentions, Hammonds had already decided to arrest Oates and Daniels. The uniformed Customs officers independently observed the large bulge in Daniels' right coat pocket and, while watching the suspects for several minutes, noticed that both Oates and Daniels appeared nervous and jittery. Inasmuch as the lounge was fairly crowded, it was decided that the most advisable course of action was to interrogate the suspects in an American Airlines office located approximately 50 feet from the boarding area. Officers Fromkin and DeAlfi then approached Oates and Daniels, who at this point were standing on the boarding line, and asked them to accompany the officers to a nearby American Airlines office. Oates and Daniels acquiesced in this request. Waiting in the office were the five BNDD special agents, the four agents other than Hammonds having been instructed by

Hammonds not to participate in any search of the suspects. Once in the office, both suspects, when asked, denied being armed. The suspects were requested to produce identification. Oates showed a driver's license which appeared proper in all respects. Daniels was unable to produce any type of identification. Fromkin then asked Oates, and DeAlfi asked Daniels, whether they objected to being frisked. They stated that they did not object. The pat-down of Oates and a look into a brown paper bag being carried by him produced no weapons or narcotics. Daniels was not so fortunate. While doing the pat-down of him, Officer DeAlfi first discovered a bulge in the suspect's right coat pocket and then a bulge on the inside of his right thigh. Because DeAlfi was unsure of what the bulge in the coat pocket was, DeAlfi removed it and found it to be nothing but an overstuffed wallet. DeAlfi did not immediately seek to remove the bulge in the area of Daniels' right thigh but instead asked Daniels what the bulge was. Daniels answered that it was "powder." The Customs officer then requested that Daniels produce the material, at which point Daniels unzipped his pants and released from his leg a brown manila envelope containing two plastic packages, one rather large, and one somewhat smaller, each containing a white powdery substance. Two of the four BNDD special agents, Lentini and Degnin, immediately placed Oates and Daniels under arrest for violation of the federal narcotics law. Although the arrest was so effected by the BNDD agents, the suspected contraband was retained by the Customs officers and the suspects were taken into custody by the Customs Service after a brief jurisdictional dispute between Customs and BNDD.

At the suppression hearing, which was held immediately prior to trial, the government took the position that Oates had no standing under Rule 41(e) of the Federal Rules of Criminal Procedure to move to suppress the evidence seized from Daniels' person. This position was based principally on two grounds. It was argued that appellant certainly did not have "actual stand-

ing" to contest the legality of the search and seizure because the search and seizure which produced the incriminating evidence was the search of and the seizure from Daniels, not any search of and seizure from Oates himself. The government further contended that appellant did not have "automatic standing" under the doctrine of *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), because he was not charged with a possessory crime as such, but only with aiding and abetting the commission of a possessory crime and with conspiring to commit that possessory crime. We hold that appellant does have "automatic standing" to challenge the legality of the search of Daniels' person and the seizure of the white powder from him.

In its brief in this Court the government suggests that we need not reach the "broader, and perhaps more important issues that inhere in the question of the continued viability of the automatic standing rule" but instead should proceed directly to the merits of the search and seizure issue, merits claimed by the government to be "frivolous." While this invitation is appealing, because the law of automatic standing is admittedly in a state of uncertainty after the United States Supreme Court's decision in *Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973), we believe that the more logical approach in these matters, *see United States v. Turk,* 526 F.2d 654, 659 n. 6 (5th Cir.) (concurring opinion), *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976),[2] is to address first the problem of whether the appellant in the

case at bar has any right to raise the issue at all. We are especially drawn to this course of action because, although we ourselves had on prior occasions expressed misgivings about the continued survival of the concept of automatic standing, *see United States v. Tortorello,* 533 F.2d 809, 814 n. 4 (2d Cir.), *cert. denied,* 429 U.S. 894, 97 S.Ct. 254, 50 L.Ed.2d 177 (1976); *United States v. Pui Kan Lam,* 483 F.2d 1202, 1205 n. 4 (2d Cir. 1973), *cert. denied,* 415 U.S. 984, 94 S.Ct. 1577, 39 L.Ed.2d 881 (1974), our recent decision in *United States v. Galante,* 547 F.2d 733 (2d Cir. 1976), has eliminated, at least until the Supreme Court itself rules definitively on the matter, any question in this circuit about the continuing viability of the "automatic standing" principle of *Jones v. United States, supra.*

It is hornbook law that, in general, "suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." *United States v. Tortorello, supra* at 814, quoting *Alderman v. United States,* 394 U.S. 165, 171–72, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). Therefore, to establish standing to move to suppress evidence on Fourth Amendment grounds, the movant must ordinarily demonstrate that the evidence was seized as a result of an invasion of his own legitimate expectation of privacy in the place searched or in his person, papers or effects. *Mancusi v. De-Forte,* 392 U.S. 364, 367–68, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968). However, the Unit-

---

**2.** Judge Goldberg's opinion in *Turk* (which must be regarded as a concurring opinion insofar as it discusses standing, see 526 F.2d at 659 n. 6) expresses well the rationale for resolving the issue of standing before reaching and deciding the merits of the search and seizure issue:

As evidenced by their concurring opinion, my Brothers believe that the threshold question of whether Turk had standing to contest the search need not be answered. Our disagreement over whether the standing issue should be pretermitted does not turn on any substantive considerations but rather reflects slightly differing views of the norms of judicial prudence. Pretermission of issues is clearly appropriate in many instances—as a

general rule of prudence, a court should reach the minimum number of issues necessary to decide the case before it. Consideration of the issue of jurisdiction, however, can never be elided. In my view, the question of standing to contest a search is similar, for purposes of determining the propriety of pretermission, to the question of jurisdiction. As with the general question of standing to sue, *see* note 7, *infra,* the question of standing to contest a search is one which asks whether an issue is justiciable. It seems to me a sound jurisprudential principle that before an issue is decided, a court should first decide that the issue is justiciable.
526 F.2d at 659 n. 6.

ed States Supreme Court in *Jones v. United States, supra,* carved out an exception to the general rule that Fourth Amendment rights may not be asserted vicariously. As well as expanding the class of persons who have a sufficient interest in the premises searched to challenge such a search, the Supreme Court in *Jones* also held, as recently explained in *United States v. Galante, supra* at 737, "that one charged with a 'possessory' crime would be given 'automatic' standing to contest the search and seizure." This holding, which represented a marked departure from then-existing Fourth Amendment law, was impelled by the "Hobson's Choice" to which defendants seeking suppression of evidence in possession cases formerly had been subjected, that the proof offered at the suppression hearing to establish "the interest in the searched premises or the seized property necessary for standing [was] often highly probative of guilt [at trial]," *United States v. Galante, supra* at 736, because, until 1968, any of the testimony given by the defendant at the suppression hearing could be used by the prosecution as substantive evidence in its case-in-chief at trial. The "automatic standing" doctrine also found its genesis in the so-called "vice of prosecutorial self-contradiction," the perceived evil being the government's denying at the suppression hearing that the defendant had a sufficient possessory interest to confer standing to challenge the search and seizure which produced the evidence while at trial attempting to prove possession. When, however, in 1968 the Supreme Court decided in *Simmons v. United States,* 390 U.S. 377, 394, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), that

"when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection," doubts arose as to whether, with the self-incrimination problem basically resolved, the "automatic standing" rule of *Jones v. United States* remained viable. In *Brown v. United States, supra,* a case in which there was no prosecutorial self-contradiction, *see* 411 U.S. at 229, 93 S.Ct. 1565, the Court acknowledged the existence of these doubts but expressly refrained from deciding whether the "vice of prosecutorial self-contradiction warrants the continued survival of *Jones'* 'automatic' standing now that . . . *Simmons* has removed the danger of coerced self-incrimination." *Id.* If *Brown* was intended as an implied invitation to overrule *Jones,* we have graciously declined that invitation, expressly deciding in *United States v. Galante, supra* at 737, that such a significant step should be taken only by the Supreme Court, not this circuit.

██ We held in *Galante* that in this circuit automatic standing exists whenever "possession at the time of the contested search and seizure is 'an essential element of the [crime] charged.'" *United States v. Galante, supra* at 738. Inasmuch as we found such standing in *Galante,* despite the fact that the vice of prosecutorial self-contradiction did not exist there, *see id.* at 737 n.4, it appears that the absence of this evil has no bearing on whether the rule of automatic standing should be applied in a particular case.[3] Turning to the requirements

---

**3.** In any event, we believe that the "vice of prosecutorial self-contradiction" is probably present in the instant case. At the suppression hearing the government claimed that appellant lacked standing to move to suppress on either the aiding and abetting count or the conspiracy count of the indictment. Although the government did concede at one point that "[i]f the defendant Paul Oates was in possession the possession was at best constructive," Suppression Hearing Transcript [hereinafter "S.H."] at 15, it then added that "there is a real question as to whether constructive possession would support standing or the implication of the automatic standing rule." *Id.* Moreover, the gen-

eral position that the government did take at this hearing was that appellant did not have possession of the suspected heroin at the time of the search and seizure but merely aided and abetted the possession by Isaac Daniels by subsidizing Daniels' transportation to and from New York City. *Id.* During the trial, however, the government took a contrary position. The complete lack of possession, or the limited type of possession (i.e., constructive possession), which the government claimed at the suppression hearing was insufficient to confer standing was apparently no bar to a claim at trial that whatever possession Oates had was a sufficient possession to obtain his conviction for posses-

for automatic standing, we must first determine what is the "crime charged." Ordinarily there would be absolutely no doubt about the answer to this inquiry. There seems to be doubt here, however. The government would have us believe that the "crimes charged" here are aiding and abetting the possession of heroin with intent to distribute, and that of conspiracy to possess heroin with the intent to distribute. While of course the government is correct with regard to the conspiracy charge, *see, e.g., United States v. Galante, supra* at 737–38; *United States v. Hearn,* 496 F.2d 236, 241 (6th Cir.), *cert. denied,* 419 U.S. 1048, 95 S.Ct. 622, 42 L.Ed.2d 642 (1974), we believe the government's position is unsupportable with respect to the "charge" of aiding and abetting possession with intent to distribute. To be sure, Count Two of the indictment here charged that "the defendant Isaac Daniels aided and abetted by the defendant Paul V. Oates knowingly and intentionally did possess with intent to distribute" heroin. Yet, the simple, although perhaps not immediately apparent, truth of the matter is that the "crime charged" here was possession with intent to distribute, not aiding and abetting possession with intent to distribute. This is so because "aiding and abetting" does not constitute a discrete criminal offense but only serves as a more

particularized way of identifying the "persons involved," *see United States v. Campbell,* 426 F.2d 547, 553 (2d Cir. 1970), in the commission of the substantive offense, and serves to describe *how* those "person[s] involved," committed the substantive offense. The foregoing propositions are made eminently clear by *United States v. Campbell, supra.* The defendant there was charged "with aiding and abetting a revenue officer in the unlawful receipt of a fee for the performance of his official duties, in violation of 26 U.S.C. § 7214 (1964) and 18 U.S.C. § 2 (1964)." 426 F.2d at 553. In arguing that the statute of limitations made specifically applicable to the substantive offense set forth in § 7214 did not apply in his case, the defendant claimed that his offense was not the substantive offense expressly created by § 7214 but was rather that of "aiding and abetting" the commission of that offense. We rejected this argument, explaining, as have other circuits, *see, e.g., Powers v. United States,* 470 F.2d 991 (5th Cir. 1972) (per curiam), that "18 U.S.C. § 2 does not define a crime; rather it makes punishable as a principal one who aids or abets the commission of a substantive crime." 426 F.2d at 553. What we meant by this remark, and what 18 U.S.C. § 2 definitely means, is made even clearer in *Campbell*

sion with intent to distribute. Throughout the entire trial the government took the position that appellant while, to be sure, assisting Daniels, himself possessed the suspected heroin. For example, no sooner had he introduced himself to the court and jury than the Assistant United States Attorney stated categorically: "Paul Oates knowingly possessed 485 grams of heroin with intent to distribute and conspired with intent to distribute, conspiring to possess approximately 485 grams of heroin." Trial Transcript [hereinafter "Tr."] at 22. The same position was repeated shortly thereafter, again in the opening statement: "The government intends to prove that Mr. Oates possessed with Mr. Daniels that quantity of heroin with intent to distribute it either here or back in Detroit." *Id.* at 28. During the trial the government stated to the court that "the defendant Oates is charged with possession of heroin with intent to distribute," *id.* at 67, and this same representation was made in the government's brief to us in the court of appeals, the government claiming that the indictment "charg[ed] appellant . . . with . . . possession of

. . . heroin with intent to distribute." Appellee's Brief at 2. In its summation to the jury at trial, the government alluded to the concept of constructive possession, *id.* at 583, an allusion clearly intended to explain the government's alternative theory of culpability. Furthermore, the government apparently requested a jury instruction on the concept of constructive possession, which the judge stated he would give, *id.* at 522–23, and that instruction was given, *id.* at 677. There is, moreover, every reason to believe that the especial attention of the jury was drawn to this particular instruction, for a note sent by the jury during its deliberations, *id.* at 715, asked the judge to explain again the count charging aiding and abetting possession with intent to distribute, "with emphasis on constructive possession and control." *Id.* at 716. It thus seems clear that at trial the government actively pursued a theory, as it would normally have a right to do, that Oates sufficiently "possessed" the drugs to be found guilty on Count Two (*see* note 1 *supra*) on that basis alone.

when we also later said that "[c]learly one can violate Section 7214(a) as an aider and abettor." 426 F.2d at 553. In other words, one who aids and abets the commission of a crime is not only *punishable as* a principal but *is* a principal. In fact, this is how 18 U.S.C. § 2 formerly was phrased before 1951 when the then existing language, "is a principal," was replaced by the phrase presently used in § 2, "is punishable as a principal." This revised language was " 'intended [only] to clarify and make certain the intent to punish aiders and abettors regardless of the fact that they may be incapable of committing the specific violation which they are charged to have aided and abetted.' . . . There is [, however,] no evidence of any Congressional intent to change the substantive law that an aider and abettor *is a principal." Swanne Soon Young Pang v. United States,* 209 F.2d 245, 246 (9th Cir. 1953) (emphasis supplied). We thus conclude that when a person is charged with aiding and abetting the commission of a substantive offense, the "crime charged" is, at least for purposes of determining whether automatic standing to challenge the legality of a search exists, the substantive offense itself. In the instant case, therefore, the "crime charged" was possession with intent to distribute, which is, in fact, one of the two specific crimes, along with conspiracy to possess with intent to distribute, which the judgment of conviction here discloses appellant was actually convicted of committing. Finally, in what may have been nothing more than Freudian slips, the government itself on at least three occasions, in its opening statement to the jury,[4] during trial [5] and in its brief here in this court, has stated that Oakes was "charged" with possession of heroin with intent to distribute. We consider these representations to be accurate.

Having found that the "crimes charged" were possession with intent to distribute [6] and conspiracy to commit such

4. Tr. at 22.

5. Tr. at 67.

6. We think it important to add that we would probably reach the same conclusion even if we were to assume arguendo, and contrary to what we believe to be clear governing standards, that the "crime charged" was really "aiding and abetting" possession rather than the possession itself. It seems clear to us that when an indictment charges aiding and abetting possession, that charge can be proven by showing that the alleged aider and abettor actually was in possession. This would appear to follow from *United States v. Scandifia,* 390 F.2d 244 (2d Cir. 1968), *vacated and remanded on other grounds,* 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969). The indictment there had relied upon another of the means, specified in 18 U.S.C. § 2, by which a defendant can commit the substantive offense, that is, the defendant was charged with "causing" the interstate transportation of counterfeit securities. The proof, on the other hand, showed that the defendant himself had transported these securities. The defendant argued "that because the indictment charged only that he 'caused' the transportation he cannot be found guilty for having transported the bonds himself." *Id.* at 250 n.6. While expressing consternation over why the defendant "was not indicted for having himself transported these bonds in interstate commerce," *id.* at 248 n.5, we nonetheless regarded the defendant's theory as less than compelling, remarking pointedly that "[i]t seems specious to argue that one who brings about a result directly cannot fairly be said to have caused that result." *Id.* at 250 n.6. Similar reasoning applies in the case at bar where the indictment relied upon the "aid and abet" language of 18 U.S.C. § 2. To paraphrase then Judge, now Chief Judge, Kaufman in *Scandifia,* it would seem specious to argue that one who brings about a result directly cannot be said to have aided and abetted that result, the result being, of course, the commission of the offense. Thus, when an indictment uses the "aid and abet" phraseology, a conviction on the underlying offense can be obtained by proof that the so-called aider and abettor actually committed the underlying offense himself. In other words, in such circumstances proof of the commission of the underlying offense is *sufficient* to prove the so-called aiding and abetting offense specified in the indictment. With respect to a charge of aiding and abetting a possession, proof of possession would therefore be a sufficient showing, although it would not be a necessary one.

As previously mentioned, the automatic standing rule applies when possession is an "essential" element of the crime charged. While one would normally take "essential" to be synonymous with "necessary," the cases, at least in this circuit, apparently consider the requirement that possession be an essential element satisfied when possession is merely *sufficient* to prove the crime charged. More particularly, in *United States v. Galante, supra* at

possession, we experience no difficulty in concluding that proof of possession is an essential element of the count charging possession with intent to distribute and we therefore hold that, as to that count, appellant has automatic standing to challenge the legality of the search of and seizure from his companion Isaac Daniels.[7]

■ Having decided that appellant has automatic standing to litigate the issue, we now consider the merits of appellant's argument that the district court erroneously denied the motion to suppress, inter alia, the white powdery substance seized from Daniels just before Oates and Daniels were formally placed under arrest. Relying upon

*Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the district court in its oral decision denied the motion on the apparent ground that the law enforcement officers had reasonable grounds to stop Oates and Daniels. Once such a lawful temporary detention was instituted, the court ruled, an agent, having good reason to believe that the suspects might be armed and dangerous, has a right to perform limited searches for weapons, a search which in the case of Daniels produced the incriminating white powdery substance. The district court also found that from the time Agent Hammonds first noticed the bulges in Daniels' clothing, there was probable cause to

---

738, we relied upon and recognized the continuing authority of *United States v. Sacco,* 436 F.2d 780 (2d Cir.), *cert. denied,* 404 U.S. 834, 92 S.Ct. 116, 30 L.Ed.2d 64 (1971). In *Sacco,* where the indictment charged conspiracy to transport stolen goods in interstate commerce, we ruled that automatic standing did not exist, apparently because "[p]roof of possession would have been *insufficient* to support the charge of conspiracy to transport stolen goods in interstate commerce; in fact, possession would not appear even to be a prerequisite to conviction on such a charge." 436 F.2d at 784 (emphasis supplied). The import of this language seems clear. If proof of possession is either sufficient or necessary to support the charge, then automatic standing exists. This reading of *Sacco* is seemingly acknowledged by *United States v. Mapp,* 476 F.2d 67, 73 (2d Cir. 1973), and is entirely consistent with *Jones v. United States, supra,* where at least one of the charges, a charge which was held sufficient to confer automatic standing, could "be established through proof *solely* of possession of narcotics." 362 U.S. at 261, 80 S.Ct. at 731 (emphasis supplied); *see id.* at 258–59, 80 S.Ct. 725. As explained above, proof of possession would be sufficient, although not necessary, to prove "aiding and abetting" possession. Thus, as in *Jones,* the so-called charge of "aiding and abetting" possession "can be established through proof solely of possession of narcotics." We therefore take it that possession can be considered an "essential" element where the indictment relies upon the aiding and abetting portion of 18 U.S.C. § 2. On the other hand, if the indictment charges, as does Count One (*see* note 1 *supra*) in this case, conspiracy to possess, it is clear that possession is not an essential element because it is neither a necessary, *see United States v. Galante, supra* at 737–38, nor a sufficient, *see United States v. Sacco, supra* at 784, element of the crime charged. Thus, even assuming "aiding and abetting" to be a crime separate and distinct from the sub-

stantive offense itself, if would seem that appellant would still have automatic standing because possession would be an "essential" element of the crime charged.

7. Appellant does not have automatic standing on the count charging conspiracy to possess heroin with intent to distribute. *United States v. Galante, supra* at 737–38. We need not consider whether appellant has *actual* standing on that count, however, because, having decided that appellant has automatic standing on the possessory count to question the propriety of the search and seizure, we certainly have a sufficient ground to consider the merits of that issue. As will appear shortly, we are persuaded that the search and seizure were proper. In the event we were not so to hold, we would then have to decide whether appellant has actual standing, as far as the conspiracy count is concerned, to challenge the search and seizure. If he did not, then we would be confronted with the troubling issues arising when, as to some counts in an indictment, standing is found to be lacking but, as to the remaining counts, standing is found *and* suppression is granted. As to these circumstances, it is worth repeating Judge Meskill's insightful remarks in *United States v. Galante, supra* at 740 n.13 (emphasis supplied):

"A difficult problem in the administration of criminal justice would arise if on a multi-count indictment, the Court were to deny standing on some counts and *grant* suppression on others. The prejudice to a defendant in such a situation could be substantial. On the other hand, it appears anomalous for the government to be in a weaker position on the counts where standing is lacking because the grand jury alleged other criminal conduct. Since this case does not raise this troubling issue, we intimate no views on the solution we would adopt in such a case."

believe that a crime had been or was being committed and that therefore an arrest at that time was proper. Appellant challenges the district court's decision in several respects. First of all, appellant argues that Oates and Daniels were actually subjected to arrest, rather than some lesser form of detention, from the moment they were asked to accompany Customs Security Officers Fromkin and DeAlfi. Correctly asserting that an arrest can be based only on probable cause and not on mere suspicion, appellant contends that no such probable cause existed at the time Oates and Daniels were accosted by the Customs officers. The arrest was therefore illegal, the argument continues, and any evidence flowing from it should have been suppressed. Appellant's second line of argument is that, even assuming, contrary to what appellant believes the evidence shows, that the initial detention was only a *Terry* stop rather than an executed arrest, there was no justification for even this more carefully circumscribed action as at that time the agents did not have specific and articulable grounds that would reasonably justify their suspicions that they were witnessing narcotics trafficking in progress. Finally, assuming arguendo that the officers were justified in making a *Terry* stop, and correctly pointing out that any search incident to such a stop must be based on a reasonable belief that the suspect is armed and dangerous and must be narrowly limited to a search for weapons, appellant contends that the officers in this case did not have any reason to believe that Oates and Daniels were carrying weapons. We find all of these arguments to be unpersuasive.

Appellant initially contends that Oates and Daniels were under arrest from the instant they were asked by Customs Security Officers Fromkin and DeAlfi to accompany them to a nearby office. We disagree. While it is clear that Oates and Daniels were not at that point free to do as they pleased, it can no longer be questioned that, although every arrest is a form of detention, the converse is not true. It is now well-settled that under certain circumstances a citizen may be temporarily detained, or, in police parlance, "stopped," for investigative purposes. *Adams v. Williams,* 407 U.S. 143, 145–46, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Terry v. Ohio, supra,* 392 U.S. at 19–22, 88 S.Ct. 1868; *United States v. Magda,* 547 F.2d 756, 758 (2d Cir. 1976); *United States v. Salter,* 521 F.2d 1326, 1328 (2d Cir. 1975); *United States v. Walling, supra* at 235; *United States v. Santana,* 485 F.2d 365, 368 (2d Cir. 1973), *cert. denied,* 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974); *United States v. Riggs,* 474 F.2d 699, 702–03 (2d Cir.), *cert. denied,* 414 U.S. 820, 94 S.Ct. 115, 38 L.Ed.2d 53 (1973); *United States v. Fields, supra* at 1197. Without commenting for the moment on the propriety of the stop in this case, it is clear from the record that neither Daniels nor Oates was actually arrested until after the white powdery substance was discovered on Daniels' person. First of all, as in *United States v. Salter, supra* at 1328, we "see nothing wrong in [the agent's] asking [Oates and Daniels] to step into the [nearby office], a place more convenient for interrogation" and more conducive to insuring the safety of other passengers in the crowded departure area. *See United States v. Lindsey,* 451 F.2d 701, 703–04 (3d Cir. 1971), *cert. denied,* 405 U.S. 995, 92 S.Ct. 1270, 31 L.Ed.2d 463 (1972). Moreover, while not dispositive, it is significant that here, unlike the situation in *United States v. Lampkin,* 464 F.2d 1093, 1094 (3d Cir. 1972), a case upon which appellant relies, Customs Security Officers Fromkin and DeAlfi did not approach Oates and Daniels with their guns already drawn. Instead, Oates and Daniels were politely requested to accompany the officers to a private room and, without objection, they acquiesced in that request. The Customs officers did not, moreover, in the boarding area or upon arrival in the private room, represent in any way that their detainees were being placed under arrest. Furthermore, it was only after the discovery of the white powdery substance and BNDD Agent Lentini's formal announcement that Oates and Daniels were being arrested that Agent Lentini informed the detainees of their constitutional rights. Our review of the record

**58**

clearly demonstrates that from the time Oates and Daniels were first approached by Fromkin and DeAlfi the actions subsequently taken against them describe a classic stop and frisk. Appellant strenuously argues that what is of crucial importance here is the subjective intention of Agent Hammonds, reached before requesting assistance from the Customs officers but unexpressed to either of them, to arrest Daniels and Oates. Hammonds' belief, however, that he had sufficient probable cause at this point to support an arrest, even assuming arguendo that belief to be wrong, and his intention to act upon that belief, are of no consequence here. What controls here is not what Hammonds subjectively intended to do but what he did. Hammonds did not disclose to either Fromkin or DeAlfi that it was his intention to arrest Daniels and Oates. The Customs officers were fully informed, however, as to all the circumstances known to Hammonds and, before approaching the two men, they independently observed the men's behavior and the bulges in Daniels' clothing. The BNDD agents were instructed by Hammonds to refrain from participating in the searches of the suspects and they complied with this order. It is thus obvious that the Customs officers were acting independently of Hammonds, a fact confirmed by the so-called "jurisdictional dispute" that arose between BNDD and Customs after the arrest. There is simply no indication that the Customs officers had any intention of arresting, or took any action that could be construed as an arrest of, the suspects before the powder was discovered on Daniels. To be sure, the actual arrest was made by two BNDD agents, one of whom was Lentini, a person who had previously intended to make an arrest. But, prior to the formal announcement of arrest, in no way whatsoever had either Hammonds or Lentini acted upon their intention to effect the arrest themselves. Moreover, even if Hammonds and Lentini thought that DeAlfi and Fromkin were in fact arresting Oates and Daniels by removing them from the boarding line, this subjective belief on their part would not affect the validity of the detention instituted independently by DeAlfi and Fromkin if all the circumstances, viewed objectively and apart from what Lentini and Hammonds thought was happening, disclose that the detention was a stop and not in fact an arrest. This is so because the issues involved in determining the propriety of stops, arrests and searches must be resolved by an objective rather than a subjective standard. *United States v. Vital-Padilla, supra* at 644;[8] *Smith v. United States,* 402 F.2d 771, 772 (9th Cir. 1968); *cf. White v. United States,* 448 F.2d 250, 254 (8th Cir. 1971), *cert. denied,* 405 U.S. 926, 92 S.Ct. 974, 30 L.Ed.2d 798 (1972).

▮ Appellant has anticipated that we might decide, as we in fact just have, that the initial removal of Oates and Daniels to the private room was not an arrest but only a *Terry*-type stop. While conceding, as he must, that *Terry v. Ohio* authorized temporary detentions based on less than full probable cause, appellant vigorously argues that the facts known to and relied upon by the government agents in this case do not generate the so-called "reasonable suspicion," *see, e. g., United States v. Magda, supra* at 758, necessary to justify a temporary stop for purposes of investigation. Our analysis of the prevailing legal standards and our examination of the record in this case indicate otherwise.

It is now axiomatic that a law enforcement officer has the power, indeed the obli-

---

**8.** "It is no answer to say that it was the officers' intention to stop every car that came along, regardless of other circumstances. The validity of stops and searches and arrests is determined by an objective, not subjective, standard. Thus, even if officers erroneously rely on a specific doctrine or presumption as entitling them to make a search or arrest, their action will be sustained if it was objectively justifiable on other grounds. Accordingly, even though the officers improperly relied upon their supposed authority to stop every vehicle on the road, they had facts within their knowledge amounting to a founded suspicion such as to make these particular stops constitutional and the stops must be upheld."
*United States v. Vital-Padilla, supra* at 644 (citations omitted).

gation,[9] to detain a person temporarily for the purpose of interrogating him if the officer reasonably suspects that the detainee has committed or is about to commit a crime. *Terry v. Ohio, supra,* 392 U.S. at 20–23, 88 S.Ct. 1868; *id.* at 34, 88 S.Ct. 1868 (Harlan, *J.,* concurring); *United States v. Magda, supra* at 758; *United States v. Riggs, supra* at 702–03; *United States v. Fields, supra* at 1197. To establish the constitutionality of the stop, however, the "officer [must be able to] point to specific and articulable facts which taken together with rational inferences from those facts, reasonably warrant that intrusion." *United States v. Magda, supra* at 758, quoting *Terry v. Ohio, supra,* 392 U.S. at 21, 88 S.Ct. 1868; *see, e. g., United States v. Riggs, supra* at 703. Inasmuch as "[t]he reasonableness of [the officer's] conduct must be determined by balancing the need for the stop against the gravity of the intrusion which the stop entailed," *United States v. Magda, supra* at 758; *accord, Terry v. Ohio, supra,* 392 U.S. at 21, 88 S.Ct. 1868; *United States v. Fields, supra* at 1197, it is readily apparent that the "specific and articulable facts" and the inferences that can be drawn from these facts relate to the need for the stop. "Need," in turn, depends on factors such as the seriousness of the offense and the likelihood of the detainee's involvement in the known or suspected criminal activity. *See United States v. Walling, supra* at 235. Obviously, if the offense is minor and there is substantial uncertainty that the detainee is involved, only a minimally intrusive stop would be proper. On the other hand, when the police officer knows or suspects that an offense with serious societal consequences is being committed and there is some reasonable possibility that the person he detains is involved, a more substantial detention is justified. Between these two extremes lie the great majority of cases; those in which the offense is minor but there is strong suspicion that the detainee is involved, or those in which the offense is egregious but the suspicion that the prospective detainee is involved amounts to little more than a visceral feeling on the part of the police officer.

We believe that the agents' stop of Oates and Daniels, while it did not rise to the level of an arrest, was enough of an intrusion upon their liberty to require more than a minimal showing of need. A significant portion of that need is supplied by the inherent odiousness and gravity of the offense, the societal costs of which, in terms of ruined and wasted lives, are staggering. We further believe that the need for the stop was supported by the fact that quick and decisive action may be required when suspected large-scale dope peddlers are about to board a jet aircraft [10] with narcotics which, as is commonly known, are a "readily disposable commodity." *United States v. Lampkin, supra* at 1097. Having said all this, we still must be able to find some "specific and articulable facts" which point logically to a reasonable possibility of the involvement of Oates and Daniels in the narcotics trafficking Agent Hammonds believed he was witnessing. We hold, as did the district court below, that the government agents had available to them and justifiably relied upon such facts when they temporarily detained Oates and Daniels.

Agent Hammonds was warranted in basing his suspicions in part on Oates' reputation as a *major* narcotics *dealer.*[11] While investigative stops certainly cannot be made "merely because [the detainees] have criminal records or bad reputations," *United States v. Fields, supra* at 1198, a police officer's knowledge of a person's reputation as a prominent narcotics trafficker can

---

9. *See, e. g., Terry v. Ohio, supra,* 392 U.S. at 23, 88 S.Ct. 1868; *United States v. Fields, supra* at 1197–98.

10. That imminent departure of the suspects from the area is a factor which can be considered in assessing need is illustrated by *United States v. Magda, supra* at 759 and *United States v. Santana, supra* at 368.

11. Of course, "need" for the stop decreases if the suspect is known as a user rather than a dealer. "Need" also decreases if the suspect is known to be associated only with drugs commonly regarded as substantially less injurious than heroin.

properly be considered, along with other factors, as an element justifying the officer's reasonable suspicion or his belief that probable cause exists, *United States v. Tramunti*, 513 F.2d 1087, 1101 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *United States v. Santana, supra* at 368; *United States v. Riggs, supra* at 701, 703; *United States v. Lampkin, supra* at 1096; *United States v. Fields, supra* at 1196, 1197. From his work in the Detroit office of BNDD Agent Hammonds was thoroughly familiar with Oates' reputed background in illicit drug peddling in the Detroit area. Significantly, Oates had been considered an important enough figure to be designated as a "target" for the federal enforcement agents located there. Furthermore, Oates' traveling with a person who was obviously a narcotics addict and Oates' eventual rendezvous in New York with a man known personally to Agent Hammonds as there being "involved in the drug culture" certainly lends substantial credence to the belief that Oates' purposes in going to New York City were far from commendable.

The level of suspicion rises when we add to the narcotics connections of the three principal characters the fact that the trip which was made here was made under circumstances which are suggestive of narcotics activity and which have been so recognized, at least implicitly, by previous cases in this and the Third Circuit. When known narcotics dealers, carrying no luggage, *see, e. g., United States v. Riggs, supra* at 701; *United States v. Fields, supra* at 1196, make air flights to other cities followed by virtually immediate return flights, a police officer might justifiably become suspicious. *See, e. g., United States v. Riggs, supra* at 703; *United States v. Lampkin, supra* at 1096. The suspicion would be particularly warranted when, as here, the nine hours spent in the city to which the narcotics dealer has traveled are from 10:00 in the evening to the early morning hours of the next day.

As well as the suspicion that could understandably be aroused in a law enforcement officer when observing three persons with narcotics backgrounds consorting during the course of a quick, overnight trip by two of them, including the one known to be a major trafficker, there were other factors here observed by the government agents which might have reasonably heightened the suspicions they already harbored. For instance, although Agent Hammonds had carefully scrutinized Daniels during the evening flight to New York on the 26th, he did not notice any unusual bulkiness in Daniels' clothing. Thus, when Agent Hammonds and the Customs officers saw the distinct bulges on Daniels on the morning of the 27th, they were properly apprehensive that the bulges might be either weapons or narcotics. Another factor upon which the officers could properly rely was the apparent effort of Oates and Daniels, who, by Agent Hammonds' own observations knew each other and had been together the previous evening, to avoid any appearance of recognition at LaGuardia Airport while waiting to board the return flight to Detroit. *See United States v. Riggs, supra* at 703; *United States v. Fields, supra* at 1196. Despite the fact that there were seats available in close proximity to where Daniels was sitting, and indeed the seat next to Daniels was unoccupied, Oates chose to sit diagonally across from Daniels. From this vantage point Oates' line of vision was unobstructed and the testimony indicates that Oates was indeed looking at Daniels or in Daniels' direction. Of course, this intentional avoidance would comport perfectly with the hypothesis that Oates, the dealer, while having an obvious interest in keeping his minion Daniels within sight, would prefer to maintain enough distance to allow a quick exit, or at least a plausible claim of ignorance, in the event the illicit transportation should be unexpectedly detected and frustrated by the authorities. Furthermore, while sitting in the departure lounge, both Oates and Daniels gave the appearance of being nervous and jittery. This behavior could reasonably suggest to the observing officers, in connection with the other circumstances of which the officers were aware, that Oates and

Daniels were engaging in conduct which could get them in trouble with the law. *See United States v. Walling, supra* at 235; *United States v. Fields, supra* at 1196 ("nervous and ill at ease"); *United States v. Lindsey, supra* at 703, 704 ("appeared nervous and was 'looking about' and 'perspiring'", "extremely anxious behavior").

In deciding whether the circumstances which we have described pass the threshold of reasonable suspicion necessary to justify the stop which was made in this case, we should emphasize that these circumstances "are not to be dissected and viewed singly; rather they must be considered as a whole." *United States v. Magda, supra* at 758, quoting *United States v. Hall*, 174 U.S.App.D.C. 13, 525 F.2d 857, 859 (D.C.Cir.1976), and they "are to be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *United States v. Magda, supra* at 758, quoting *United States v. Hall, supra*, 525 F.2d at 859. That it is the police officer's perspective from which the reasonableness of his suspicion must be gauged has been firmly established by a long line of cases which have either expressly so stated or alluded to the officer's training or experience. *See Terry v. Ohio, supra*, 392 U.S. at 23, 88 S.Ct. 1868; *United States v. Magda, supra* at 758; *United States v. Salter, supra* at 1328; *United States v. Walling, supra* at 235; *United States v. Santana, supra* at 368. Thus, it may well be that some patterns of behavior which may seem innocuous enough to the untrained eye may not appear so innocent to the trained police officer who has witnessed similar scenarios numerous times before. In this case, the principal law enforcement officer, Special Agent Hammonds, was a highly experienced narcotics undercover officer who was thoroughly familiar with the dope peddler's clandestine methods of doing business. We therefore find him to have been particularly

capable of comprehending the significance of the activities of Paul Oates and Isaac Daniels on the night of April 26 and the morning of April 27, 1972. As was the Third Circuit in *United States v. Lampkin, supra* at 1096, we are satisfied that to Agent Hammonds' eye "[t]here were far too many interrelated factors to have been the result of pure coincidence." We therefore hold that "[t]he combination of these circumstances sufficed to meet the rather lenient test for a stop which the Supreme Court, reversing [the Second Circuit], applied in *Adams v. Williams*." *United States v. Santana, supra* at 368.

That the initial "stop" was permissible does not, of course, establish, without more, that any search, or "frisk," incident to that stop was equally sustainable. Case law teaches that any search of the detainees must be limited to a protective frisk for weapons, *see, e. g., Adams v. Williams, supra*, 407 U.S. at 146, 92 S.Ct. 1921; *Terry v. Ohio, supra*, 392 U.S. at 29, 88 S.Ct. 1868, and before such a pat-down search can be conducted the police officer must have reason to believe that the suspect may be armed and dangerous. *E. g., Terry v. Ohio, supra*, 392 U.S. at 27, 88 S.Ct. 1868. We do not hesitate to uphold the pat-down search conducted by Customs Security Officers DeAlfi and Fromkin in this case, for we believe that the officers were fully justified under the circumstances in believing that either Oates or Daniels or both of them might be armed and dangerous.[12] First of all, the bulges in Daniels' clothing were highly suspicious, *see, e. g., United States v. Lindsey, supra* at 703, 704; *United States v. Marshall*, 142 U.S.App.D.C. 167, 440 F.2d 195, 197 (D.C. Cir.), *cert. denied*, 400 U.S. 909, 91 S.Ct. 153, 27 L.Ed.2d 148 (1970), and a reasonable police officer, in the interest of protecting himself, can surely, at the very least, feel the bulge to ascertain whether it

---

12. While we do not rely on this factor, appellant and Daniels apparently did consent to the frisk performed by the Customs officers. Great caution must be exercised in deciding that any consent given while in custody status is voluntary, but it is possible for a suspect to give such voluntary consent. *United States v. Wiener*, 534 F.2d 15, 17 (2d Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976).

is, in fact, a weapon.[13]  If by touch the officer remains uncertain as to whether the article producing the bulge might be a weapon, he is entitled to remove it.  Here Customs Security Officer DeAlfi justifiably removed Daniels' wallet when he could not determine what caused the bulge by feeling it through Daniels' outer clothing.  Secondly, the police officer's own experience can serve as a critical factor in deciding to conduct a "frisk":

> And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the *specific reasonable inferences which he is entitled to draw from the facts in light of his experience.*

*Terry v. Ohio, supra,* 392 U.S. at 27, 88 S.Ct. at 1883 (emphasis supplied).  It was Agent Hammonds' personal experience that persons arrested as narcotics violators often were found in possession of weapons at the time of their arrest.[14]  Indeed, even apart from the agent's personal experiences, we have recognized that to "substantial dealers in narcotics" firearms are as much "tools of the trade" as are most commonly recognized articles of narcotics paraphernalia. *United States v. Wiener,* 534 F.2d 15, 18 (2d Cir.), *cert. denied,* 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976).  We are in full agreement with Judge Friendly's remarks in *United States v. Santana, supra* at 368, that "[w]hile [a narcotics agent may have] received no specific information that [a narcotics dealer or his companion] was armed, it would not be unreasonable for a policeman to assume that a man believed to be one of the top narcotics violators in [a major metropolitan] area [or his companion] would be carrying arms or would be otherwise violent."  As did Judge Friendly in *Santana,* the Supreme Court in *Terry v. Ohio* indicated that, despite the fact that the police officer has not personally observed a weapon or any physical indication, such as a bulge, that would indicate the presence of a weapon, the belief of the police officer that the suspect may be armed and dangerous can be predicated on the nature of the criminal activity involved. *See* 392 U.S. at 27–28, 88 S.Ct. 1868.[15]  Fi-

---

13.  "The crux of this case, however, is not the propriety of Officer McFadden's taking steps to investigate petitioner's suspicious behavior, but rather, whether there was justification for McFadden's invasion of Terry's personal security by searching him for weapons in the course of that investigation.  We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him.  Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.  American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded.  Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives."

*Terry v. Ohio, supra,* 392 U.S. at 23–24, 88 S.Ct. at 1881.

"The easy availability of firearms to potential criminals in this country is well known and has provoked much debate. . . . Whatever the merits of gun-control proposals, this fact is relevant to an assessment of the need for some form of self-protective search power."

*Id.* at 24 n.21, 88 S.Ct. at 1881.

14.  *See* note 13 *supra.*

15.  "[The police officer] had observed Terry, together with Chilton and another man, acting in a manner he took to be preface to a 'stick-up.'  We think on the facts and circumstances Officer McFadden detailed before the trial judge a reasonably prudent man would have been warranted in believing petitioner was armed and thus presented a threat to the officer's safety while he was investigating his suspicious behavior.  The actions of Terry and Chilton were consistent with McFadden's hypothesis that these men were contemplating a daylight robbery—*which, it is reasonable to assume, would be likely to involve the use of weapons*—and nothing in their conduct from the time he first noticed them until the time he confronted them and identified himself as a police officer gave him sufficient reason to negate that hypothesis.  Although the trio had departed the original scene, there was nothing to indicate abandonment of an intent to commit a robbery at some point. . . .  We cannot say his decision [after questioning the suspects] to seize Terry and pat his clothing for weapons

nally, we believe that inherent in *Terry v. Ohio* is the notion that the standard of suspicion necessary to allow a frisk for weapons is not a difficult one to satisfy, for even if " 'the belief that [the suspect] might be carrying a weapon rested upon fragile grounds' . . . courts should not set the test of sufficient suspicion that the individual is 'armed and presently dangerous' too high when protection of the investigating officer is at stake." *United States v. Riggs, supra* at 705. We therefore find that the Customs officers in this case were entitled to pat down both the suspects.

This brings us to the point at which Customs Security Officer DeAlfi felt the bulge on Daniels' right thigh. In contrast to DeAlfi's quick removal of the overstuffed wallet when he felt it, DeAlfi did not immediately seek to remove or to ask Daniels to remove whatever article was causing the leg bulge. The wallet felt harder to the touch and, without removal, it would have been difficult to determine whether it was a weapon. The thigh bulge, on the other hand, was presumably not so rigid and therefore there conceivably might have been less likelihood that it was a weapon. While it may well be that DeAlfi, in view of all the other circumstances, had probable cause to make an arrest upon feeling the thigh bulge, we need not so decide. We prefer, instead, to focus on DeAlfi's immediate response to his feeling the bulge. He asked Daniels what the bulge was. He had, of course, every right to so inquire, for the right to interrogate during a "stop" is the essence of *Terry* and its progeny. Once Daniels said "Powder," probable cause clearly existed, and any of the government agents present was fully entitled, in view of all the circumstances, to make an arrest, for the existence of a probable cause sufficient to support an arrest may develop during the course of a stop based on reasonable suspicion. *See, e. g., Adams v. Williams, supra,* 407 U.S. at 148, 92 S.Ct. 1921; *United*

States v. Walling, supra* at 236; *United States v. Riggs, supra* at 704; *White v. United States, supra* at 253. Moreover, if, as was the case here, the search is conducted in compliance with the governing constitutional standards, it is immaterial that what was discovered is not the article for which the police officers were originally and specifically looking. *Abel v. United States,* 362 U.S. 217, 238, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); *United States v. Edwards,* 498 F.2d 496, 500 (2d Cir. 1974) (Friendly, J.); *United States v. Bell,* 464 F.2d 667, 674 (2d Cir.), *cert. denied,* 409 U.S. 991, 93 S.Ct. 335, 34 L.Ed.2d 258 (1972). Finally, we should stress that, despite the fact that the white powdery substance was discovered only on Daniels, probable cause then existed to arrest Oates as well as Daniels. *See, e. g., United States v. Vital-Padilla, supra* at 644; *cf. United States v. Salter, supra* at 1328.

The motion to suppress was properly denied.

## II

Appellant next claims that the trial court committed error by admitting into evidence at trial two documentary exhibits purporting to be the official report and accompanying worksheet of the United States Customs Service chemist who analyzed the white powdery substance seized from Isaac Daniels. The documents, the crucial nature of which is beyond cavil, concluded that the powder examined was heroin. Appellant contends, first of all, that under the new Federal Rules of Evidence (hereinafter "FRE") the documents should have been excluded as hearsay and, alternatively, that, even if they were not inadmissible on that basis, their exclusion was nonetheless required because their admission into evidence over appellant's objection would have violated and did violate appellant's right under the Sixth Amendment to the United

---

was the product of a volatile or inventive imagination, or was undertaken simply as an act of harassment; the record evidences the tempered act of a policeman who in the course of an investigation had to make a

quick decision as to how to protect himself and others from possible danger, and took limited steps to do so."
*Terry v. Ohio, supra,* 392 U.S. at 28, 88 S.Ct. at 1883. (Emphasis supplied.)

States Constitution to confront the witnesses against him. Before discussing the merits of these contentions, which raise difficult and important issues of evidential and constitutional law, it will be helpful to describe briefly the circumstances surrounding the admission of the report and the worksheet.

At trial the government had planned upon calling as one of its final witnesses a Mr. Milton Weinberg, a retired United States Customs Service chemist who allegedly had analyzed the white powder seized from Isaac Daniels. It seems that Mr. Weinberg had been present on the day the trial had been scheduled to commence but he was not able to testify then because of a delay occasioned by the unexpected length of the pretrial suppression hearing. The government claims that by the time Weinberg was rescheduled to testify he had become "unavailable." The Assistant United States Attorney explained the circumstances of this unavailability as follows: "I am told by his wife [he is] very sick. Apparently he has some type of bronchial infection." [16] After a short adjournment the prosecutor added the following comment: "Mr. Weinberg called my office this morning and I was made known about it about 10:30 this morning, prior to coming upstairs." [17] Considering these two explanations to be consistent with each other, it appears that Weinberg called the United States Attorney's office to inform them of his unavailability and that subsequently the Assistant United States Attorney attempted to speak to Weinberg personally but was able, for some reason, to speak only to Weinberg's wife who advised that Weinberg had "some type of bronchial infection." There is no indication in the record as to why the Assistant United States Attorney was at that time unable to speak to Weinberg himself, although earlier that day Weinberg had been able to carry on a telephone conversation. Nor is there any other indication in the record that the prosecutor made any further attempts to confirm the fact that Weinberg was ill, and, if so, how ill he might be. No request was made of the district court for a brief continuance for the purpose of determining the nature and expected duration of Weinberg's illness.

Before the onset of Weinberg's bronchial condition, the prosecutor had planned to call Weinberg for the purpose of eliciting from him testimony that Weinberg had analyzed the powder seized from Daniels and found it to be heroin. When Weinberg became "unavailable," the government decided to call another Customs chemist, Shirley Harrington, who, although she did not know Weinberg personally, was able to testify concerning the regular practices and procedures used by Customs Service chemists in analyzing unknown substances. Through Mrs. Harrington the government was successful in introducing Exhibits 13 and 12 which purported to be, respectively, the handwritten worksheet used by the chemist analyzing the substance seized from Daniels and the official typewritten report of the chemical analysis. The report summarizes salient features of the worksheet. Mrs. Harrington claimed to be able to ascertain from the face of the worksheet the various steps taken by Weinberg to determine whether the unknown substance was, as suspected, heroin. When the defense voiced vigorous objection to the attempt to introduce the documents through Mrs. Harrington, the government relied upon three different hearsay exceptions contained in the new Federal Rules of Evidence to support its position that the documents were admissible. While principal reliance was placed on the modified "business records" exception found in FRE 803(6), the evidence was also claimed to be admissible under FRE 803(8) as a "public record" or under FRE 803(24). The defense was primarily concerned that the defendant was being denied his Sixth Amendment right to confront his accusers, in this case, the missing chemist Weinberg.

Mrs. Harrington was obviously an experienced chemist, having conducted thousands

---

**16.** Tr. at 442.

**17.** Tr. at 449.

of tests while working for the Customs Service, including hundreds designed to identify heroin. She was also an experienced witness, having testified "probably a hundred or so" times [18] in the course of her duties with the Customs Service. She had never worked with Weinberg personally and had never observed him perform any chemical tests. She had never received any notes or letters from him, but she identified Weinberg's writing on Exhibit 13 and his signature on Exhibit 12, presumably because she had, in accordance with Customs Service practices, reanalyzed, prior to destruction, substances Weinberg had previously analyzed shortly after the substances were seized.

The defense, in addition to having no opportunity to cross-examine Weinberg, the chemist who had performed the analysis, was also disturbed about two other circumstances surrounding the introduction of Exhibits 12 and 13. In particular, the defense was surprised that Exhibit 12, the official typewritten report, contained Weinberg's signature, for no such signature had appeared on the copy of this exhibit given to the defense beforehand. Moreover, the defense was particularly, and understandably, distressed about the absence of Weinberg in view of the fact that the two exhibits differed in one important particular, a particular in which they certainly should have been identical. A notation pertaining to the chain of custody of the powder within the agency appeared on both exhibits, in typewritten form on the official report and in handwriting, presumably Weinberg's, on the worksheet. The notation read "Received from and returned to CSO Fromkin." On the typewritten official report, however, this statement had been crossed out, although it still was legible beneath the scribbling. Mrs. Harrington knew nothing about this deletion. There is nothing in the exhibits themselves or in the testimony of any witnesses that would explain why, when and by whom this deletion was made.

We now turn to consider appellant's claims that the chemist's report and worksheet were excludable on either evidential or constitutional grounds. Mindful of our responsibility to avoid, if at all possible, dispositions on constitutional grounds, we shall first determine whether the chemist's documents were admissible under the new Federal Rules of Evidence. In view of the unquestionably crucial character of these documents, constituting as they do the only evidence in the case establishing that the confiscated substance was heroin, a holding that the Federal Rules of Evidence precluded their admission would obviate the need for our resolving what we regard as substantial and complex constitutional issues relating to the Sixth Amendment right to confrontation.

■ It is eminently clear that the report and worksheet were "written assertions" constituting "statements," FRE 801(a)(1), which were "offered [by the prosecution] in evidence [at trial] to prove the truth of the matters asserted [in them]." FRE 801(c). As such, they were hearsay and, for our present purposes, under FRE 802 were inadmissible "except as [otherwise] provided by" other provisions of the Federal Rules of Evidence. The so-called "exceptions" to the hearsay rule are delineated in FRE 803 and 804. What immediately catches one's attention upon referring to these sections is the prefatory language of each: "The following *are not excluded* by the hearsay rule. . . ." (Emphasis supplied.) These two rules enumerating the exceptions to the hearsay rule are thus *not* designed to insure *admissibility* of the questioned evidence but only designed to prevent automatic exclusion on hearsay grounds. Why this language was drafted in this fashion, and why, as we shall see, other specific language, either contained in the rules as proposed to and approved by Congress or inserted by Congress itself during the legislative process, was drafted with comparable circumspection, is succinctly explained by the Advisory Committee on the Rules of Evidence (hereinafter "Advisory Committee") in the Notes of the Advisory

---

**18.** Tr. at 440.

Committee on Proposed Rules, Introductory Note to Article VIII, 56 F.R.D. 183, 292 (1972) (hereinafter "Advisory Committee's Notes"). The reason for "the exceptions set forth in Rules 803 and 804 [being] stated in terms of exemption from the general exclusionary mandate of the hearsay rule, rather than in positive terms of admissibility," is the Advisory Committee's "recognition of the separateness of the confrontation clause [of the Sixth Amendment to the United States Constitution] and the hearsay rule" and its desire "to avoid inviting collisions between" the two. *Id.* Indeed, although "[u]nder the earlier cases, the confrontation clause may have been little more than a constitutional embodiment of the hearsay rule, even including traditional exceptions but with some room for expanding them along similar lines . . ., under the recent [court] cases the impact of the clause clearly extends beyond the confines of the hearsay rule." These remarks leave absolutely no doubt, of course, that the draftsmen were fully aware of the "significant recent developments," *see, e. g.,* 5 Wigmore, Evidence § 1397, at 155 (Chadbourn rev. 1974), concerning the right to confrontation which had occurred and were likely to occur in the future. The remarks also evince a clear intention to draft the rules in such a way as to eliminate, if possible, any tension between the hearsay rule as embodied in Article VIII of the Federal Rules of Evidence and the confrontation clause.

These efforts to avert the possibility of conflict between the hearsay exceptions and the confrontation clause find their most emphatic expression in FRE 803(8) and it is to that provision that we now turn. On this appeal the government and the appellant are in complete disagreement over the materiality of FRE 803(8) to the issue of whether the chemist's report and worksheet were excludable as hearsay. Although at trial the government placed some reliance on FRE 803(8), the so-called "public records and reports" exception to exclusion, in its brief in this court it completely ignores the provision, apparently abandoning any reliance on it for reasons we shall discuss below. Instead, it urges us to find that the

challenged evidence falls easily within the scope of what has traditionally been labeled the "business records exception" to the hearsay exclusionary rule, the codification of which in the Federal Rules of Evidence is found in FRE 803(6). Appellant, on the other hand, vigorously asserts that the issue of whether the chemist's report and worksheet were fatal hearsay can be correctly evaluated only by a careful study of the precise wording of FRE 803(8) and the legislative intent underlying the enactment of that rule.

While the problem presented is not susceptible of any facile solution, we believe that, on balance, appellant's emphasis on the importance of FRE 803(8) is well-founded. It would certainly seem to be the exception which would logically come to mind if a question arose as to the admissibility of reports of the kind we are considering in this case. Moreover, although as a general rule there is no question that hearsay evidence failing to meet the requirements of one exception may nonetheless satisfy the standards of another exception, *see, e. g., United States v. Smith,* 172 U.S.App.D.C. 297, 521 F.2d 957, 964 (D.C. Cir. 1975), and there thus might be no need to examine FRE 803(8) at all, we agree with appellant that both the language of Rule 803(8) and the congressional intent, as gleaned from the explicit language of the rule and from independent sources, which impelled that language have impact that extends beyond the immediate confines of exception (8) itself. We therefore regard FRE 803(8) as the proper starting point for our evidentiary analysis.

That the chemist's report and worksheet could not satisfy the requirements of the "public records and reports" exception seems evident merely from examining, on its face, the language of FRE 803(8). That rule insulates from the exclusionary effect of the hearsay rule certain:

(8) *Public records and reports.*—Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities

of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil cases and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

While there may be no sharp demarcation between the records covered by exception 8(B) and those referenced in exception 8(C), *see, e.g., United States v. Smith, supra,* 521 F.2d at 968 n.24, and indeed there may in some cases be actual overlap, we conclude without hesitation that surely the language of item (C) is applicable to render the chemist's documents inadmissible as evidence in this case, and they might also be within the ambit of the terminology of item (B), a claim appellant argues to us persuasively.

It is manifest from the face of item (C) that "factual findings resulting from an investigation made pursuant to authority granted by law" are not shielded from the exclusionary effect of the hearsay rule by "the public records exception" if the government seeks to have those "factual findings" admitted *against* the accused in a criminal case. It seems indisputable to us that the chemist's official report and worksheet in the case at bar can be characterized as reports of "factual findings resulting from an investigation made pursuant to authority granted by law." The "factual finding" in each instance, the conclusion of the chemist that the substance analyzed was heroin, obviously is the product of an "investigation," [19] *see, e.g., Martin v. Reyn-*

olds Metal Corp., 297 F.2d 49, 57 (9th Cir. 1961) (" 'investigation', when liberally construed, includes the sampling and *testing* here contemplated") (emphasis supplied), supposedly involving on the part of the chemist employment of various techniques of scientific analysis. Furthermore, in view of its reliance on the chemist's report at trial and its representation to the district court that "chemical analys[e]s of unidentified substances are indeed a regularly conducted activity of the Customs laboratory of Customs chemists," [20] the government here is surely in no position to dispute the fact that the analyses regularly performed by United States Customs Service chemists on substances lawfully seized by Customs officers are performed pursuant to authority granted by law.

Though with less confidence, we believe that the chemist's documents might also fail to achieve status as public records under FRE 803(8)(B) because they are records of "matters observed by police officers and other law enforcement personnel." Although in characterizing the chemist's report and worksheet here it is quite accurate to designate those reports as the reports of factual findings made pursuant to an investigation, the reports in this case conceivably could also be susceptible of the characterization that they are "reports . . . setting forth . . . (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report." If this characterization is justified, the difficult question would be whether the chemists making the observations could be regarded as "other law enforcement personnel." We think this phraseology must be read broadly enough to make its prohibitions against the use of government-gener-

---

**19.** That "investigation" can encompass scientific testing is clearly shown by the Advisory Committee's Notes which, while noting "the variety of situations encountered" by courts deciding the admissibility of reports of this nature, *see* Advisory Committee's Notes, Note to Paragraph (8) of Rule 803, 56 F.R.D. at 312, characterize as "evaluative reports" certificates issued pursuant to 18 U.S.C. § 4245 and findings made pursuant to 7 U.S.C. § 78. (Section 78 has been modified substantially by Act

of August 15, 1968, Pub.L.No.90–487, 82 Stat. 761 so that the relevant portions of former section 78 now appear to be contained in 7 U.S.C. § 79 instead.)

Certificates under 18 U.S.C. § 4245 are based on psychiatric and psychological examinations while findings made pursuant to the former 7 U.S.C. § 78 could be based on testing of grain.

**20.** Tr. at 444.

ated reports in criminal cases coterminous with the analogous prohibitions contained in FRE 803(8)(C). *See United States v. Smith, supra*, 521 F.2d at 968–69 n.24. We would thus construe "other law enforcement personnel" to include, at the least, any officer or employee of a governmental agency which has law enforcement responsibilities. Applying such a standard to the case at bar, we easily conclude that full-time chemists of the United States Customs Service are "law enforcement personnel." The chemist in this case was employed by the Customs Service, a governmental agency which had clearly defined law enforcement authority in the field of illegal narcotics trafficking;[21] the officers who actually seized the suspected contraband were employed by the Customs Service, and the unidentified substance was delivered by them to a laboratory operated by the Customs Service. The unidentified substance was then subjected to analysis by a chemist, one of whose regular functions is to test substances seized from suspected narcotics violators. Chemists at the laboratory are, without question, important participants in the prosecutorial effort. As well as analyzing substances for the express purpose of ascertaining whether the substances are contraband, and if so, participating in eventual prosecution of narcotics offenders, the chemists are also expected to be familiar with the need for establishing the whereabouts of confiscated drugs at all times from seizure until trial. Moreover, the role of the chemist typically does not terminate upon completion of the chemical analysis and submission of the resulting report but participation continues until the chemist has testified as an important prosecution witness at trial. Indeed, Mrs. Harrington had herself testified "probably a hundred or so" times.[22] Also of some interest perhaps is a remark made by Mrs. Harrington which indicates that the Customs chemists do not mentally disassociate themselves from those who undoubtedly are law enforcement personnel. After chemical analyses are per-

formed, according to Mrs. Harrington, "the material [is] returned to the agent or *our* Customs officer."[23] (Emphasis supplied.) In short, these reports are not "made by persons and for purposes unconnected with a criminal case [but rather they are a direct] result of a test made for the specific purpose of convicting the defendant and conducted by agents of the executive branch, the very department of government which seeks defendant's conviction." *State v. Larochelle*, 112 N.H. 392, 400, 297 A.2d 223, 228 (1972) (dissenting opinion). It would therefore seem that if the chemist's report and worksheet here can be deemed to set forth "matters observed," the documents would fail to satisfy the requirements of exception FRE 803(8) for the chemist must be included within the category of "other law enforcement personnel."

Our conclusion that the chemist's report and worksheet do not satisfy the standards of FRE 803(8) comports perfectly with what we discern to be clear legislative intent not only to exclude such documents from the scope of FRE 803(8) but from the scope of FRE 803(6) as well. The reason why such a restrictive approach was adopted can be established by referring to the Advisory Committee's Notes and by examining the way in which Congress revised the draft legislation proposed by the Advisory Committee and which the Supreme Court submitted to Congress. As already explained, an overriding concern of the Advisory Committee was that the rules be formulated so as to avoid impinging upon a criminal defendant's right to confront the witnesses against him. The Advisory Committee, in unequivocal language, offers the specter of collision with the confrontation clause as the explanation for the presence of FRE 803(8)(C) in its proposed (and, since FRE 803(8)(C) was unaltered during the legislative process, final) form:

In one respect, however, the rule with respect to evaluative reports under [FRE 803(8)(C)] is very specific: they are ad-

**21.** *See, e.g.,* 26 U.S.C. § 7607.

**22.** Tr. at 440.

**23.** Tr. at 459.

missible only in civil cases and against the government in criminal cases in view of the *almost certain collision with confrontation rights which would result from their use against an accused in a criminal case.*

Advisory Committee's Notes, Note to Paragraph (8) of Rule 803, 56 F.R.D. at 313 (emphasis supplied). This preoccupation with preserving the confrontation rights of criminal defendants was shared by a Congress which established enhanced protection for those rights by substantially amending the proposed language of FRE 803(8)(B). An amendment offered by Representative David Dennis added important qualifying language to item (B) which before the amendment deemed as "public records" under FRE 803(8) "matters observed pursuant to duty imposed by law as to which matters there was a duty to report." *See* 120 Cong. Rec. 2387 (1974). The amendment qualified the foregoing language by adding "excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel." *Id.* In the debate that followed the offer of this amendment, the accused's right to confront the witnesses against him was advanced as the impetus for the proposal. Speaking in support of the amendment, Representative Elizabeth Holtzman understood one of its purposes to be to "[reaffirm] the right of cross examination to the accused." *Id.* at 2388.[24] In a similar vein, Representative Dennis, the sponsor of the proposal,[25] confirmed that this was the intent of the amendment by emphasizing that the amendment pertained to "criminal cases, and in a criminal case the defendant should be confronted with the accuser to give him the chance to cross examine." *Id.* Following the addition of this language excluding reports reciting

matters observed by law enforcement personnel, *see* 120 Cong.Rec. 2389 (1974), the Senate added to the pending legislation a proposed FRE 804(b)(5) which would have rendered the exclusion of such reports from the scope of FRE 803(8)(B) ineffective in the event the author of the report was "unavailable" to testify. *See* S.Rep.No. 1277, 93d Cong., 2d Sess. 17 (1974), reprinted in U.S.Code Cong. & Admin.News 1974, pp. 7051, 7064. This attempt to emasculate the Dennis amendment proved to be abortive, however, for the Committee of Conference removed it from the pending legislation. *See* H.R.Rep.No.1597, 93d Cong., 2d Sess. 12 (1974) (Joint Explanatory Statement of the Committee of Conference), reprinted in U.S.Code Cong. & Admin.News 1974, pp. 7098, 7104–05.

The discussion in the preceding paragraphs describes *why* Congress decided to take the approach it did with regard to the use of "evaluative" reports under FRE 803(8)(C) and reports of law enforcement personnel under FRE 803(8)(B). The *result* Congress intended was the absolute inadmissibility of records of this nature, and that this was, indeed, the result which Congress believed it had achieved by Rules 803(8)(B) and (C), could not have been articulated with any more clarity than it was by Representative William L. Hungate. As Chairman of the House Judiciary Subcommittee on Criminal Justice, Representative Hungate had been responsible for presiding over extensive hearings on the proposed Federal Rules of Evidence and must be regarded as one of the legislators most knowledgeable about the then pending legislation. Representative Hungate was also a floor manager for the legislation and a member of the Committee of Conference appointed to resolve the differences be-

**24.** Although Representative Holtzman supported the Dennis amendment, she eventually spoke in opposition to the adoption of the final version of the proposed rules and voted accordingly. *See* 120 Cong.Rec. H12257, H12259 (Dec. 18, 1974).

**25.** It is, of course, well-established that the sponsor's interpretation of his proposal, when expressed prior to adoption of the legislation, is

entitled to great weight. *See, e.g., NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760,* 377 U.S. 58, 66, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964); *City of New York v. Train,* 161 U.S.App.D.C. 114, 494 F.2d 1033, 1039 (D.C. Cir. 1974), *aff'd,* 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975); *Department of Water & Power v. Allis-Chalmers Mfg. Co.,* 213 F.Supp. 341, 350–51 (S.D.Cal.1963).

tween the versions of the rules as approved by the House and Senate. After the committee had agreed upon its final version of the rules to be submitted to both houses of Congress for final approval, Representative Hungate presented to the House the official report of the Committee of Conference. At the time he made this presentation, the congressman made a lengthy statement, *see* 120 Cong.Rec. H12253 (daily ed. Dec. 18, 1974), the purpose of which was to "discuss a few of the more important matters and how the Conference handled them." *Id.* He informed the House that the Committee of Conference had rejected the Senate's attempt to create a new hearsay exception which would have permitted admission of police reports authored by officers unavailable to testify. He explained the meaning of the remaining related provisions:

> As the rules of evidence now stand, police and law enforcement reports are not admissible against defendants in criminal cases. This is made quite clear by the provisions of rule 803(8)(B) and (C).

120 Cong.Rec. H12254 (daily ed. Dec. 18, 1974). This unequivocal language shows that it was Representative Hungate's understanding, and he was as familiar with the legislation as anyone else in Congress,[26] that the language retained in FRE

---

**26.** It is clear that "[r]esort may be had to the statements of such an *authoritative* person," *Ideal Farms, Inc. v. Benson,* 288 F.2d 608, 616 (3d Cir. 1961) (emphasis supplied), *cert. denied,* 372 U.S. 965, 83 S.Ct. 1087, 10 L.Ed.2d 128 (1963), as Representative Hungate. What persons may be regarded as "authoritative" is equally well-established by numerous cases which have addressed this question. The sponsor of the legislation would surely be regarded as such a person. *See* note 25, *supra.* So, too, the floor managers, *see, e.g., City of New York v. Train, supra,* 494 F.2d at 1039 n.16; *Pan American World Airways, Inc. v. CAB,* 380 F.2d 770, 781–82 (2d Cir. 1967), *aff'd,* 391 U.S. 461, 88 S.Ct. 1715, 20 L.Ed.2d 748 (1968); *Gold Kist, Inc. v. United States,* 339 F.Supp. 1249, 1253 (N.D.Ga.1971) (three-judge court), *aff'd sub nom. ICC v. Gold Kist, Inc.,* 409 U.S. 808, 93 S.Ct. 106, 34 L.Ed.2d 67 (1972); *Ideal Farms, Inc. v. Benson, supra* at 616; the members of the congressional committee which holds hearings on the proposed legislation, *see City of New York v. Train, supra,* 494 F.2d at 1039 n.16; *Pan American World Airways, Inc. v. CAB, supra* at 782 & n.14; and particularly the chairman of such a committee, *see Gold Kist, Inc. v. United States, supra* at 1253; *Department of Water & Power v. Allis-Chalmers Mfg. Co., supra* at 351; and the members of the conference committee, *see, e.g., City of New York v. Train, supra,* 494 F.2d at 1039 n.16; *Pan American World Airways, Inc. v. CAB, supra* at 780, 782, are regarded as persons whose views, when expressed in the floor debates prior to passage of the legislation, are entitled to particular deference.

Indeed, we have previously rejected the argument that "in construing [a] statute we should not give any weight to statements made in floor debate." *Pan American World Airways, Inc. v. CAB, supra* at 781. In rejecting this contention that certain statements made by the floor managers of the legislation should have been disregarded, we relied upon the fact that the "floor managers were members of the legislative committees that held extensive hearings and were responsible for formulating the legislation." *Id.* at 782. The propriety of our position in *Pan American* was, as was pointed out there, clearly compatible with Supreme Court authority which had regarded as "authoritative indicators of congressional intent," *id.,* certain statements of congressmen who were neither sponsors nor conference committee members. *Id.*

The weight to which the views of any particular congressman is entitled will vary, of course, with the legislator's familiarity with, and participation in the shaping of, the legislation. It would be difficult to imagine anyone more qualified to comment on the legislation in this case than was Representative Hungate who, as member and Chairman of the House Judiciary Subcommittee on Criminal Justice, and as floor manager and as conference committee member probably had more contact with the proposed rules than any other single legislator. When such impressive credentials exist, we believe that the congressman's "statements in explaining the bill to the House, and the answers made by him to questions asked by members may be considered in construing the bill as it was subsequently enacted into law. These statements are in the nature of supplemental committee reports and are entitled to the same weight accorded to formal committee reports." *Department of Water & Power v. Allis-Chalmers Mfg. Co., supra* at 351; *accord, Gold Kist, Inc. v. United States, supra* at 1254 ("explanatory statements in the nature of a supplemental report made by the committee member in charge of the bill in the course of its passage may be regarded as an exposition of the legislative intent"); *cf. Pan American World Airways, Inc. v. CAB, supra* at 782.

Finally, we should note that the D.C. Circuit in *United States v. Smith, supra,* 521 F.2d at 968–69 n.24, has previously recognized the authority of the specific remarks of Representative Hungate upon which we rely.

803(8)(B) and (C) meant that those provisions had the *effect* of rendering absolutely inadmissible against defendants in criminal cases the "police reports" of item (B) and the "evaluative reports" of item (C).

Representative Hungate's remarks would not be comprehensively all-encompassing, of course, if the police and evaluative reports denied the benefit of qualifying under FRE 803(8)(B) and (C) were considered eligible for qualification under FRE 803(6), the so-called business records exception, or under any other exception to the hearsay rule. In that event, such reports, upon qualifying under FRE 803(6) or any other exception, although they would not at that point be automatically admissible, *see* FRE 803, 402, would be one step closer to achieving admission, and would not be, contrary to Representative Hungate's understanding, definitely "not admissible against defendants in criminal cases."

Indeed, this very question of whether so-called police reports disqualified under FRE 803(8) could nonetheless gain eventual admission by first satisfying the standards of some other hearsay exception was expressly raised by Representative Elizabeth Holtzman after Representative Hungate had presented to the House his explanation of the Committee of Conference's actions. Representative Holtzman was particularly concerned with the Committee of Conference's retention of what she termed, *see* 120 Cong.Rec. H12255, H12256 (daily ed. Dec. 18, 1974), the "open-ended" exceptions to the hearsay rule, the exceptions contained in FRE 803(24) and 804(b)(5). Speaking in opposition to the proposed legislation,[27] Representative Holtzman suggested that the police reports which the Committee of Conference, in rejecting the Senate's proposal to allow such reports to qualify as an exception to the hearsay rule when the authors were unavailable, had gone to such trouble to exclude, would now be able to qualify under another hearsay exception, specifically FRE 803(24) or 804(b)(5). She stated:

> [T]he conference committee rejected a proposed rule from the Senate which would have allowed police reports to be admitted as substantive evidence. However, by simultaneously adopting this open-ended hearsay exception, the conference report opens a "back door" to these police reports and negates the conference committee's prior prohibition against admission of such evidence.

120 Cong.Rec. H12255–56 (daily ed. Dec. 18, 1974). Moments later, she reemphasized her concern:

> *But is it not true that all the work that* our subcommittee and the Committee on the Judiciary went through to try to clarify the exceptions can virtually be undone by this because it allows any court to use any exception; as an example outside police reports, which the committee said could not come in.
>
> Are police reports without policemen to testify permitted by the rules as we were given them by the Supreme Court? Therefore, we are talking about comparable standards of trustworthiness. Can a judge say, "Well, sure, the policeman is not available; he is on a trip, or something. We will use his police report."
>
> And that is the basis for a conviction.

120 Cong.Rec. H12257 (daily ed. Dec. 18, 1974). Representative David Dennis, an active participant in the floor debate, the sponsor of the amendment excluding police reports, a floor manager of the legislation and a member of the Committee of Conference, responded, politely but bluntly:[28]

27. The United States Supreme Court has, of course, "often cautioned against the danger of reliance upon the views of [a bill's] opponents. In their zeal to defeat a bill, they understandably tend to overstate its reach. 'The fears and doubts of the opposition are no authoritative guide to the construction of legislation. It is the sponsors that we look to when the meaning of the statutory words is in doubt.' " *NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760, supra,* 377 U.S. at 66, 84 S.Ct. at 1068, quoting in part *Schwegmann Bros. v. Calvert Distillers Corp.,* 341 U.S. 384, 394–95, 71 S.Ct. 745, 95 L.Ed. 1035 (1951).

28. Representative Dennis' remarks are also entitled to great weight. *See* note 26 *supra.*

I would like to say in answer to my friend, the gentlewoman from New York, that this business of using a police report, if a policeman is unavailable, was not in the rules as they came to us. That was written in by the Senate, and we struck it out in the conference, I am very happy to say. It was a terrible idea. But since we did take it out in the conference, and since it is gone, and since we insisted that it go, I cannot see how anybody could suggest that introducing such a report is possible or a thing that could be done under these rules; because the Senators put it in and we took it out in conference, and that is the legislative history.

*Id.* While Representative Dennis did not specifically allude to evaluative reports or. item (C), as did Representative Hungate, we think it clear that this was only because his response was tailored to the precise question propounded by Representative Holtzman. There is absolutely no reason to doubt that, if specifically asked, he would have answered that government-generated "evaluative reports" were similarly disqualified under *any* exception to the hearsay rule because, "as Representative Hungate's statement indicates, the prohibitory lan-

guage of 803(8)(B), added on the floor of the House, should be read in conjunction with the more carefully drafted parallel provision of 803(8)(C)." *United States v. Smith, supra,* 521 F.2d at 969 n.24.

■ It is, of course, of critical importance that it was with the explanations of Representatives Hungate and Dennis freshly in mind that the full House of Representatives on the very day these remarks were uttered finally approved the Federal Rules of Evidence.[29] We thus think it manifest that it was the clear intention of Congress to make evaluative and law enforcement reports absolutely inadmissible against defendants in criminal cases. Just as importantly, it must have been the unquestionable belief of Congress that the language of FRE 803(8)(B) and (C) accomplished that very result.

■ Despite what we perceive to be clear congressional intent that reports not qualifying under FRE 803(8)(B) or (C) should, and would, be inadmissible against defendants in criminal cases, the government completely ignores those provisions, as well as FRE 803(24), another hearsay exception upon which it relied at trial,[30] and argues instead that the chemist's report and

29. Of Representative Dennis' statement, perhaps it might be said, as was said in *Gold Kist, Inc. v. United States, supra* at 1253: "This was the final . . . word on the subject . . in the bill's legislative history. It was uttered plainly and in such circumstances that it would not be unreasonable to conclude that had [Representative Dennis'] answer been otherwise, [Article VIII] would have been subjected to change and likely would not have been passed by the [House] in the exact form it was." We should also add that *NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760, supra,* 377 U.S. at 69–70, 84 S.Ct. at 1070, where the Court noted that the Senate "had the benefit only of Senator Kennedy's statement of the purpose of the proviso," appears to be judicial recognition that legislators, when voting to approve bills, do so with the intent that the legislation should have the meaning which conforms to the explanations of the bills given to them by their most knowledgeable colleagues.

30. We agree with the government's appeal strategy. We think it clear that any reliance on FRE 803(24) or reliance on FRE 803(24)'s counterpart, FRE 804(b)(5), would be a mistaken reliance. Both of these hearsay exceptions, the first pertaining to the use of extra-judicial

statements of available declarants, and the second concerning the use of extra-judicial statements made by unavailable declarants, state in terms too clear to require much elaboration:

However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

Although we stress that it was through no fault of his own, the Assistant United States Attorney did not in advance of trial inform his adversary of the government's intention to offer the hearsay statements of the chemist Weinberg. Furthermore, our review of the relevant portions of the transcript, *see, e.g.,* Tr. at 449, leaves the distinct impression that prior to the calling of witness Harrington to the stand, the defense was unaware that the chemist's report and worksheet would be offered in lieu of the testimony of Weinberg himself. In other words, not only did the defense not receive notice in advance of trial, it did not receive any

notice at all until the actual appearance of witness Harrington in the late afternoon of the fourth day of trial.

There is absolutely no doubt that Congress intended that the requirement of advance notice be rigidly enforced. As originally drafted, FRE 803(24) and 804(b)(5) (then denominated "804(b)(6)") each established a hearsay exception for any "statement not specifically covered by any of the foregoing exceptions [of FRE 803 and 804, respectively] but having comparable circumstantial guarantees of trustworthiness." The House at first completely eliminated these provisions from the proposed legislation. *See* S.Rep.No.1277, 93d Cong., 2d Sess. 18 (1974). The Senate, however, replaced the deleted 803(24) and 804(b)(6) with provisions which retained the requirement of the original proposals that the hearsay statement "must have 'equivalent circumstantial guarantees of trustworthiness' " but imposed additional requirements for admission, namely, that before admission the court must determine that (1) the statement is "offered as evidence of a material fact"; (2) "the statement 'is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts' "; and (3) "the general purposes of [the rules of evidence] and the interests of justice will best be served by admission of the statement into evidence." S.Rep.No.1277, 93d Cong., 2d Sess. 19–20 (1974), reprinted in U.S.Code Cong. & Admin. News 1974, pp. 7051, 7066. The Senate amendments were accepted by the Committee of Conference, but only after incorporating the *additional limiting language requiring that advance notice be given.* H.Rep.No.1597, 93d Cong., 2d Sess. 11–12, 13 (1974), reprinted in U.S.Code Cong. & Admin.News 1974, pp. 7093, 7105, 7106.

Reference to the congressional debates confirms that there were serious misgivings about possible overbreadth of the original proposals submitted to Congress and of the Senate's modified version of the original proposals. Our examination of the congressional debates further discloses that the requirement that notice be given in advance of trial was the method selected by the Committee of Conference to prevent abuse of FRE 803(24) and 804(b)(5). Moreover, when reporting to the House of the Committee's recommendations Representative Hungate's, *see* note 26 *supra,* explanation of the advance notice requirement leaves no doubt that it was the intention of Congress that that requirement be read strictly. Responding to criticism that FRE 803(24) and 804(b)(5) were too broad, Representative Hungate stated:

[T]he party requesting the court to make the statement under this provision must notify the adverse party of this fact, and the notice must be given sufficiently in advance of trial and hearing to provide any adverse party a fair opportunity to object or contest the use of the statement.

We met with opposition on that. There were amendments offered that would let them do this right on into trial. But we thought the requirement should stop prior to trial and they would have to give notice before the trial. That is how we sought to protect them.

120 Cong.Rec. H12256 (daily ed. Dec. 18, 1974). Later, he elaborated:

[W]e narrowed the rule by the language that he sees: ". . . a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial," et cetera.

*Id.* Shortly thereafter, Representative Dennis, *see* note 27 *supra,* corroborated Representative Hungate's explanation:

We took this [hearsay exception] out completely, and I would like to have left it out, frankly. . . . What the Senators did was put it back in and then they added this language about (A), (B), (C) that the gentleman from California (Mr. Danielson) referred to, and said that this principle would apply only where the statement is offered as evidence of a material fact, where it is more probative on the point for which it is offered than anything else the proponent can procure, and, again, where the general purposes of these rules and the interests of justice will best be served.

We still did not like it very well, so we then wrote in the conference a provision which said that even so, one cannot do it, even with all of this language, which includes the Court's language and the Senate's language, without giving the other side notice before trial so that counsel knows such an attempt is going to be made, and he can get ready for it.

Therefore, that is the situation as it stands.

120 Cong.Rec. H12256–57 (daily ed. Dec. 18, 1974). These remarks manifest an intent that there be undeviating adherence to the requirement that notice be given in advance of trial. Such adherence was conspicuously absent in the case at bar.

In any event, subsequent to his comments specifically addressed to the requirement of advance notice, Representative Dennis, as discussed earlier in this opinion, emphatically stated, in response to Representative Holtzman's suggestion that police reports might be admissible under the so-called "open-ended" exceptions of FRE 803(24) and 804(b)(5), that he could not "see how anybody could suggest that introducing such a report is possible or a thing that can be done under these rules; because the Senators put it in and we took it out in conference, and that is the legislative history." 120 Cong.Rec. H12257 (daily ed. Dec. 18, 1974).

worksheet in the case at bar fall clearly within the literal terms of the modified business records exception to the hearsay rule contained in FRE 803(6), entitled *"Records of regularly conducted activity."* That rule reads as follows:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

.   .   .

(6) *Records of regularly conducted activity.*—A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

At the outset we state that we do not regard a case upon which the government heavily relies, *United States v. Frattini,* 501 F.2d 1234, 1236 (2d Cir. 1974), as controlling in the instant case.[31] Aside from its misplaced reliance on *Frattini,* however, the government's argument that the documents in this case satisfy the requirements of the modified "business records" exception is not altogether unappealing if it is assessed strictly on the basis of the literal language of FRE 803(6) and without reference to either the legislative history or the language of FRE 803(8)(B) and (C). For instance, it is true that, traditionally, a proponent's inability to satisfy the requirements of one hearsay exception does not deny him the opportunity to attempt to meet the standards of another. *See, e.g., United States v. Smith, supra,* 521 F.2d at 964. Secondly, it is clear from the explicit inclusion of the words "opinions" and "diagnoses" in FRE 803(6) that, in one sense anyway, Congress intended to expand, or at least ratify, the view of prior court cases that had expanded the concept of what constitutes a "business record." The Advisory Committee's Notes confirm this. Advisory Committee's Notes, Note to Paragraph (6) of Rule 803, 56 F.R.D. at 309. It is reasonable to assume that a laboratory analysis may well be an "opinion." Thirdly, the testimony of Mrs. Harrington, a "quali-

**31.** The government, relying upon *Frattini,* informs us that the rule in this circuit is that a "bare" chemist's report is admissible in evidence as a "business records" exception to the hearsay rule. There are several weaknesses, however, in the government's reliance upon *Frattini. Frattini* was decided August 21, 1974, long before either the effective date, or the date of enactment of the Federal Rules of Evidence; it does not purport in any way to be interpreting proposed hearsay exceptions contained in the then pending legislation; and it must yield to what we regard as clear congressional intent that, under the circumstances present here, a contrary result is required. Beyond this, the comment in *Frattini* that a "bare" chemist's report would be admissible was a purely gratuitous comment, and, while entitled, of course, to some deference, the remark was dictum. Moreover, the only case which *Frattini* cited as authority for the proposition that a "bare" chemist's report is admissible as a business record was *United States v. Ware,* 247 F.2d 698, 699 (7th Cir. 1957). That case reached a

similar conclusion only over the vehement objection of one of the three panel members who pointedly noted that the two-member majority had not cited even one case to support its position. Furthermore, *Ware* was decided long before the recent wave of cases broadening the interpretation of the confrontation clause; and, while the hearsay rule and the confrontation clause are independent of one another, subsequent decisions expanding confrontation rights have probably influenced the interpretation of the business records exception to the hearsay rule. *See, e.g., State v. Russell,* 114 N.H. 222, 224–25, 317 A.2d 781, 782 (1974). In any event, even assuming *Frattini* provides the legal arena in which our case must be contested, it is not at all certain that the chemist's report and worksheet here could be considered "bare" chemist's reports. More particularly, the inscriptions on the documents, including the stricken one on the report, pertaining to the chain of custody within the agency could well remove these documents from the category of "bare" chemist's reports.

fied witness," established that it was a regular practice of the Customs laboratory to make written reports of their analyses and that these particular written reports were made in the regular course of the laboratory's activities. However, not nearly as clear is whether under the facts here the "method or circumstances of preparation" might not "indicate lack of trustworthiness." The language contained within the subordinate "unless" clause creates an exception to the general language of FRE 803(6) and, as such, "is . . . subject to the rule of strict construction; that is, any doubt will be resolved in favor of the general provision and against the exception, and anyone claiming to be relieved from the statute's operation must establish that he comes within the exception." E. Crawford, The Construction of Statutes § 299, at 610 (1940); *accord, e.g., United States v. First City National Bank,* 386 U.S. 361, 366, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967); *Rheem Manufacturing Co. v. Rheem,* 295 F.2d 473, 475 (9th Cir. 1961); *Canadian Pacific Ry. Co. v. United States,* 73 F.2d 831, 834 (9th Cir. 1934); Advisory Committee's Notes, Note to Paragraph (6) of Rule 803, 56 F.R.D. at 310 ("Consequently the rule proceeds from the base that records made in the course of a regularly conducted activity will be taken as admissible but subject to authority to exclude if 'the sources of information or other circumstances indicate lack of trustworthiness.' ") Here there are some "circumstances of preparation [which tend to] indicate lack of trustworthiness." As already noted, Exhibits 12 and 13 differ from each other in one significant respect in which they should be identical. On both, in handwriting on the worksheet and in typewritten form on the official report, the notation "Received from and returned to CSO Fromkin" appears. Yet, on the report this notation has been crossed out. Nothing indicates who deleted the notation, when it was deleted, or why it was deleted and, as it relates to the issue of chain of custody, it is a matter of some importance. Moreover, before trial defense counsel was given what was purported to be a copy of the official chemist's report. Yet, this doc-ument did not contain the signature of the certifying chemist Weinberg. At trial the official report the government offered *was* signed. Assuming that Weinberg did sign the document the government offered, there is obviously a question as to *when* this document was signed, it not being unreasonable to assume that it was signed after the government had already given the defense a copy of an originally unsigned report. However, while we are troubled by these concededly unusual circumstances, and it may well be that they raise ample doubts to require exclusion on the face of FRE 803(6) alone, we prefer not to predicate our decision on a finding that the "circumstances of preparation indicate lack of trustworthiness." Instead, we assume for purposes of argument here, that, as sedulously asserted by the government, the chemist's report and worksheet might fall within the literal language of FRE 803(6).

For purposes of our present analysis, we thus consider the situation to be that the chemist's documents might appear to be within the literal language of FRE 803(6) although there is clear congressional intent that such documents be deemed inadmissible against a defendant in a criminal case. This would not be the first time that a court has encountered a situation pitting some literal language of a statute against a legislative intent that flies in the face of that literal language. Our function as an interpretive body is, of course, to construe legislative enactments in such a way that the intent of the legislature is carried out. *E.g., Knapp v. McFarland,* 462 F.2d 935, 939 (2d Cir. 1972); *Cawley v. United States,* 272 F.2d 443, 445 (2d Cir. 1959) (L. Hand, *J.*). In recognition of this responsibility numerous courts have either applied, *see, e.g., United States v. Campos-Serrano,* 404 U.S. 293, 298–301, 92 S.Ct. 471, 30 L.Ed.2d 457 (1971); *Lynch v. Overholser,* 369 U.S. 705, 710–20, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962) (Harlan, *J.*); *Board of Governors of Federal Reserve System v. Agnew,* 329 U.S. 441, 446–49, 67 S.Ct. 411, 91 L.Ed. 408 (1947); *Knapp v. McFarland, supra* at 939–40; *Cawley v. United States, supra* at 445;

*United States v. Camean,* 174 F.2d 151, 152–53 (2d Cir. 1949) (L. Hand, *J.*); *Markham v. Cabell,* 148 F.2d 737, 739 (2d Cir.) (L. Hand, *J.*), aff'd, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945); *accord, United States v. Smith,* 172 U.S.App.D.C. 297, 521 F.2d 957, 968–69 n.24 (D.C.Cir. 1975); *Los Angeles Mailers Union No. 9 v. NLRB,* 114 U.S. App.D.C. 72, 311 F.2d 121, 123–25 (D.C.Cir. 1962); *In Re Avien, Inc.,* 390 F.Supp. 1335, 1339–41 (E.D.N.Y.1975), aff'd, 532 F.2d 273 (2d Cir. 1976), or at least recognized, *see, e.g., Commissioner of Internal Revenue v. Brown,* 380 U.S. 563, 571, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965); *Malat v. Riddell,* 383 U.S. 569, 571–72, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966) (per curiam), the principle that, despite the existence of literal language that might dictate a contrary result, a court should interpret a statute in such a way as to effectuate clear legislative intent.

How potent these principles of statutory construction can be is dramatically illustrated by *Lynch v. Overholser, supra,* and by our own decisions in *Cawley v. United States, supra,* and more recently in *Knapp v. McFarland, supra.* In *Lynch,* the Supreme Court, speaking through Justice John Harlan, was confronted with a statute, apparently clear on its face, which required that any criminal defendant acquitted on the grounds of insanity be automatically committed to a mental institution. Lynch had been so acquitted, but he himself had not raised that defense. While conceding that a literal construction of the statutory language would require Lynch's commitment, the Supreme Court, looking to the "general pattern of laws governing the confinement of the mentally ill in the District of Columbia, [and to] the congressional policy that impelled the enactment of [the] mandatory commitment provision," 369 U.S. at 710, 82 S.Ct. at 1067, refused to adopt a literal construction of the statute but instead construed it to apply only to a defendant who had affirmatively asserted an insanity defense. *Id. Knapp v. McFarland, supra* at 939–40, is also very much on

point. The New York statute there under analysis, one pertaining to the state procedures for enforcement of foreign judgments, defined a "foreign judgment" as "any judgment, decree or order of a court of the United States or of any other court which is entitled to full faith and credit in" the State of New York. *Id.* at 939. While conceding that "at first blush" the literal language of the statute, "a court of the United States," might appear to refer to a federal court, we nevertheless relied upon the legislative intent to the contrary in deciding that "a court of the United States" actually should be construed less literally to mean a court of a sister state. *Id.* Judge Mansfield's sagacious remarks in *Knapp* bear repeating here:

> "[O]ur function is to give effect to the Legislature's intent, and where a literal reading leads to an illogical result, the tempering influence of reasonable construction must be applied. 'There is no surer way to misread any document than to read it literally.'"

*Id.* at 939, quoting in part *Guiseppi v. Walling,* 144 F.2d 608, 624 (2d Cir. 1944) (L. Hand, *J.,* concurring), aff'd, 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945). That this court has not been loath to allow literalness to fall prey to "reasonable construction" to effectuate legislative intent is further illustrated by our decision in *Cawley v. United States, supra.* There, a petition for naturalization had been denied because the government felt that the petitioner, a seaman, had not met the statutory requirement that he have "served honorably or with good conduct" for an aggregate period of five years on certain vessels. *Id.* at 445. The record disclosed that the petitioner had served on these ships for less than five years; the proof did reveal, however, that he had spent almost three years in an American hospital following his final voyage during the course of which he had become ill. This court, speaking through Judge Learned Hand, who was joined by Judge Henry Friendly,[32] relied on the ancient maritime privilege of maintenance

---

**32.** The author of this opinion does not hesitate to point out that he was the panel member who dissented.

and cure in finding that the time period of petitioner's detention in the American hospital should be added to his period of actual shipboard service to ascertain how long he had "served." *Id.* This was thought to be consistent with legislative intent because the petitioner could be scrutinized to see whether he was a person of good moral character just as easily in an American hospital as he could be on an American vessel. Of the majority's approach in *Cawley,* Judge Hand wrote, *id.* at 445 (emphasis supplied):

It must be owned that at first blush this appears to be an untenable gloss upon the section. On the other hand, unless they explicitly forbid it, the *purpose* of a statutory provision is the best test of the meaning of the words chosen. We are to put ourselves so far as we can in the position of the legislature that uttered them, and decide whether or not it would declare that the situation that has arisen is within what it wished to cover. Indeed, at times the purpose may be so manifest as to override even the explicit words used. . . . We do not have to go so far in the case at bar, but we did resort to the purpose of this section in *United States v. Camean,* 2 Cir., 174 F.2d 151, 152 and decided that the term, 'vessels of the United States,' in § 1441(a)(2), which literally meant vessels owned by American corporations, should be construed to include a vessel whose title was in a foreign corporation all of whose shares were owned by an American corporation.

As a final demonstration of how pivotal a consideration legislative intent can be, we need go no further than to point out that legislative intent can transform the meaning of a word such as "primarily" from its commonly understood and literal meaning, "principally," *see Malat v. Riddell, supra,* 383 U.S. at 572, 86 S.Ct. 1030, to such an unexpected one as "substantially," *see Board of Governors of Federal Reserve System v. Agnew, supra,* 329 U.S. at 446, 67 S.Ct. 411.

In light of this paramount importance of legislative intent, we shall now attempt to ascertain the legislative intent underlying FRE 803(6). Such inquiry, involving as it does a search for the *meaning* of the legislation, *see* E. Crawford, The Construction of Statutes § 162, at 250 (1940), is often impeded by the absence of specific explanations of the meaning of the statute from the draftsmen of the legislation or from other pertinent legislative sources. In such circumstances available information concerning the *purpose* behind the use of the language that appears in the law can often be of invaluable assistance in helping the court determine the meaning of that statutory language. *Cawley v. United States, supra* at 445; E. Crawford, The Construction of Statutes § 161 (1940). In the case at bar our task is considerably facilitated by the presence of both explicit explanations of the *meaning* of relevant provisions of the Federal Rules of Evidence, and an abundant supply of information relating to one important *purpose* in drafting those provisions as they were drafted.

As already mentioned, Representative William Hungate, in presenting the report of the Committee of Conference to the House of Representatives, left no doubt that it was the belief of the Committee of Conference that under the new Federal Rules of Evidence the *effect* of FRE 803(8)(B) and (C) was to render law enforcement reports and evaluative reports inadmissible against defendants in criminal cases. It is thus clear that the only way to construe FRE 803(6) so that it is reconcilable with this intended effect is to interpret FRE 803(6) and the other hearsay exceptions in such a way that police and evaluative reports not satisfying the standards of FRE 803(8)(B) and (C) may not qualify for admission under FRE 803(6) or any of the other exceptions to the hearsay rule. That Congress must have understood that all the hearsay exceptions would be construed in light of the carefully drafted proscriptions of FRE 803(8) is also demonstrated, as discussed earlier in this opinion, by Representative Dennis' categorical remarks to that effect.

■ Even if the remarks of Representatives Hungate and Dennis were not as clear as they are, we could still reach the same conclusion that, in view of the articulated purpose behind the narrow drafting of FRE 803 in general and FRE 803(8) in particular, FRE 803(6) must be read in conjunction with FRE 803(8)(B) and (C). Specifically, the pervasive fear of the draftsmen and of Congress that interference with an accused's right to confrontation would occur was the reason why in criminal cases evaluative reports of government agencies and law enforcement reports were expressly denied the benefit to which they might otherwise be entitled under FRE 803(8). It follows that this explanation of the reason for the special treatment of evaluative and law enforcement reports under FRE 803(8) applies with equal force to the treatment of such reports under *any* of the other exceptions to the hearsay rule. The prosecution's utilization of any hearsay exception to achieve admission of evaluative and law enforcement reports would serve to deprive the accused of the opportunity to confront his accusers as effectively as would reliance on a "public records" exception. Thus, there being no apparent reason why Congress would tolerate the admission of evaluative and law enforcement reports by use of some other exception to the hearsay rule (for example, the "business records" exception of FRE 803(6) or the "open-ended" exceptions of FRE 803(24) or 804(b)(5)), it simply makes no sense to surmise that Congress ever intended that these records could be admissible against a defendant in a criminal case under *any* of the Federal Rules of Evidence's exceptions to the hearsay rule. As noted, the accuracy of this reasoning is borne out dramatically by the remarks of Representative Dennis in response to fears expressed by Representative Holtzman that police reports clearly inadmissible under FRE 803(8) might be able to qualify under FRE 803(24) or 804(b)(5).

We are not the first court to indulge in a less than literal construction of a hearsay exception so as to effectuate congressional intent. An issue addressed by the D.C. Circuit in *United States v. Smith, supra,* 521 F.2d at 968–69 n.24, was whether the police reports of FRE 803(8)(B) are admissible *against* the government. While conceding that "[o]n its face, 803(8)(B) appears to [say that they are not, the court was] convinced, however, that 803(8)(B) should be read, in accordance with the obvious intent of Congress and in harmony with 803(8)(C) to authorize the admission of the reports of police officers and other law enforcement personnel at the request of the defendant in a criminal case." 521 F.2d at 968 n.24. The "obvious intent of Congress" in enacting FRE 803(8)(B) was found to be that "use of reports against defendants would be unfair." 521 F.2d at 969 n.24. "Since there [was] no apparent reason to allow defendants to use the reports admitted by 803(8)(C) but not those governed by 803 (8)(B) [, the court concluded] that a police report . . . is an exception to the new hearsay rules when introduced at the request of the defense." 521 F.2d at 969 n.24. *Smith* is important in several respects. It, too, recognized the importance of Representative Hungate's remarks concerning the meaning of the proposed rules. As have we, the court in *Smith* liberally construed the new hearsay rules and, in fact, carved out an implied exception to the explicit language of the rules. In so doing, *Smith* was attempting to harmonize two provisions which, if read literally, might produce a result clearly at odds with the legislative intent. Our approach in the case at bar closely parallels that taken by the D. C. Circuit in *Smith.*

While reading an implied exception into FRE 803(6) is, to be sure, a less than literal way of construing that provision, the rules of statutory construction discussed earlier in this opinion certainly warrant such treatment when the legislative intent is as clear as it is here. Beyond Representative Hungate's explicit statement of the legislation's meaning and Representative Dennis' graphic affirmation of that explanation, there is, as already mentioned, abundant evidence of legislative purpose regarding Article VIII in general and FRE 803 in particular. An examination of this information convinces

us that when there is tension between the confrontation clause of the Sixth Amendment to the United States Constitution and the literal language of the various hearsay exceptions it was the congressional intent that a less literal reading of the rules would be justified.

As explained earlier, both the Advisory Committee and the Congress were preoccupied with "avoid[ing] inviting collisions" between the hearsay rule and the confrontation clause. This intense desire to avoid creating tensions between the two was articulated in the Advisory Committee's Notes, see Advisory Committee's Notes, Introductory Note to Article VIII and Note to Paragraph (8) of Rule 803, 56 F.R.D. at 292, 313, and in the House debates, see, e.g., 120 Cong.Rec. 2387–88 (1974), and was acted upon in Congress by the excision of the Senate's then proposed Rule 804(b)(5) from the pending legislation, see H.R.Rep.No. 1597, 93d Cong., 2d Sess. 12 (1974), and by approval of the Dennis amendment to FRE 803(8)(B), see 120 Cong.Rec. 2389 (1974), the Advisory Committee's language in FRE 803(8)(C) and the prefatory language of FRE 803 and 804. In particular, the novelty of the prefatory language applicable to FRE 803(6) ("The following are not excluded by the hearsay rule") is best appreciated by recalling that this rule's predecessor, 28 U.S.C. § 1732, did not merely make evidence meeting its requirements "not exclud[able] by the hearsay rule" but rather made that evidence immediately admissible upon its qualifying as a "business record" under § 1732. It was thus with great solicitude for a criminal defendant's right to confront his accusers that the current hearsay exceptions were drafted and adopted.

The extent of this concern becomes especially apparent, of course, in FRE 803(8)(B) and (C). The Advisory Committee noted there that the evaluative reports of item (C) are "admissible only in civil cases and against the government in criminal cases in view of the *almost certain collision with confrontation rights* which would result from their use against an accused in a criminal case." Advisory Committee's Notes, Note to Paragraph (8) of Rule 803, 56 F.R.D. at 313 (Emphasis supplied). At first reading, one would understand the reference to "almost certain collision" to mean that there was a fear that, if the language of FRE 803(8)(C) were not drafted, as it was, to deny to evaluative reports the privilege of qualifying as a "government record" under FRE 803(8), then the rule itself might be constitutionally infirm. But, on a closer look, one realizes that no matter how broadly drafted any of the discrete hearsay exceptions might be, no application, in and of itself, of any of the exceptions could ever violate the confrontation clause. This is so because, first, the rules enumerating the hearsay exceptions, FRE 803 and 804, do *not* make evidence of a hearsay nature which fits within the exceptions to exclusion admissible but only make it "not excluded by the hearsay rule," and, second, FRE 402 expressly incorporates as a precondition to admissibility of *any* evidence a full compliance with the requirements of the United States Constitution. Given these two factors, it is clear that the concern motivating the precise formulations of FRE 803(8)(B) and (C), to avoid inviting collisions between the confrontation clause and the hearsay exceptions, should not be understood as being a fear that a particular hearsay exception might be unconstitutional, on its face or as applied; but rather as being a firm concern that the language of the draft of the hearsay exceptions would serve as a filter to screen out evidence which might be suspect in the event of a constitutional challenge on confrontation grounds. We thus consider it clear that Congress has expressed a firm intention that, if there are plausible doubts that evidence fitting within the literal terms of a hearsay exception could survive confrontation analysis, the hearsay exception should be construed with considerable flexibility so that the court can, if possible, avoid deciding the constitutional question. The Congress has cast its lot with the forces favoring peaceful coexistence between the confrontation clause and the hearsay exceptions. This court should certainly do its utmost to contribute to that desired alleviation of tension by so

interpreting the hearsay exceptions when necessary.[33]

If we were to construe FRE 803(6) in an overly literal fashion and find that the chemist's report and worksheet constituted "business records" under that rule, the collision which the Congress so assiduously tried to "avoid inviting" would be that much nearer to occurring, for, under the circumstances of the case at bar, there exist legitimate doubts, *cf. Lynch v. Overholser, supra,* 369 U.S. at 710–11, 82 S.Ct. 1063; *International Association of Machinists v. Street,* 367 U.S. 740, 749, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), regarding the constitutionality of the introduction of these documents. We must stress, however, that we do not decide whether appellant's right to confrontation was violated here. The brief discussion which follows is intended only to point out that, in an unsettled and evolving area of the law appellant's constitutional argument raises sufficiently substantial and difficult questions, *see, e.g., United States v. Puco,* 476 F.2d 1099, 1103 n.6 (2d Cir.), *cert.*

*denied,* 414 U.S. 844, 94 S.Ct. 106, 38 L.Ed.2d 82 (1973); *United States v. Bell, supra* at 670; *United States v. Yates,* 173 U.S.App.D.C. 308, 524 F.2d 1282, 1286 n.10 (D.C.Cir.1975), to persuade us that this case is best decided on narrow statutory grounds. Such a decision is entirely consistent with the congressional intent to draft hearsay exceptions which would not "collide with" the confrontation clause and is fully consonant with out own philosophy of avoiding deciding difficult constitutional questions when it is unnecessary to do so. *See, e.g., Fine v. City of New York,* 529 F.2d 70, 76 (2d Cir. 1975).

■ The government steadfastly maintains that the constitutional issue in this case is devoid of merit. It claims that once an extra-judicial statement satisfies the standards of a well-recognized exception to the hearsay rule, the introduction of the statement into evidence can never be thwarted by the confrontation clause of the Sixth Amendment to the United States Constitution.[34] Whatever the law on this

---

**33.** Further indication that a flexible interpretation of FRE 803(6) was anticipated and encouraged by Congress is revealed by another significant aspect in which the present "business records" exception, FRE 803(6), differs from the old, 28 U.S.C. § 1732. The old version conditioned admissibility on no more than a showing that the record was made in the regular course of business and that it was the regular practice of the business to keep such records. "All other circumstances of the making . . . may be shown to affect its weight, but such circumstances shall not affect its admissibility." *Id.* The newly enacted version, on the other hand, recognizes that evidence otherwise meeting the requirements of FRE 803(6) may now be inadmissible because "the source of information or the methods or circumstances of preparation indicate lack of trustworthiness." This complete reversal of philosophy is apparently a legislative ratification of the many cases, such as *Palmer v. Hoffman,* 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943), which had read implied exceptions into the language of the old statute despite the fact that the purport of the statute was clear on its face. Advisory Committee's Notes, Note to · Paragraph (6) of Rule 803, 56 F.R.D. at 309–10. This ratification demonstrates a legislative intention that flexibility of the type we have employed here should be exercised when the new "business records" exception is construed or judicially interpreted. And, perhaps, in view

of Representatives Hungate's and Dennis' descriptions of the meaning of the law, it can be inferred that the inadmissibility of police reports and evaluative reports under 803(8)(B) and (C) establish, per se, without more, that, as to FRE 803(6), "the source of information or the methods or circumstances of preparation [of those reports] indicate lack of trustworthiness."

**34.** The Sixth Amendment to the United States Constitution provides in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." It is clear that in the context of the confrontation clause, the "witness against" the accused is the extra-judicial declarant, and not the live witness who merely narrates the hearsay at trial. *E.g., Park v. Huff,* 506 F.2d 849, 863 (5th Cir.) (en banc) (Wisdom, J., with whom four other judges joined, dissenting), *cert. denied,* 423 U.S. 824, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975); *Park v. Huff, supra* at 864–65 (Thornberry, J., with whom five other judges joined, dissenting); *Phillips v. Neil,* 452 F.2d 337, 347 (6th Cir. 1971), *cert. denied,* 409 U.S. 884, 93 S.Ct. 96, 34 L.Ed.2d 141 (1972); *State v. Wiley,* 295 Minn. 411, 420–21, 205 N.W.2d 667, 674–75 (1973); *State v. Miller,* 42 Ohio St.2d 102, 105, 326 N.E.2d 259, 262 (1975); *State v. Tims,* 9 Ohio St.2d 136, 138, 224 N.E.2d 348, 351 (1967); *Commonwealth v. McCloud,* 457 Pa. 310, 315–16 n.6,

point may once have been, there can no longer be any doubt that, despite the fact that an extra-judicial statement may satisfy the requirements of a recognized exception to the hearsay rule, the introduction of such a statement may in certain circumstances be barred because that introduction, if accomplished, would violate the defendant's right to confrontation. *United States v. Puco, supra* at 1102; *id.* at 1107 n.1 (opinion on petition for rehearing).[35] While the admission of an extra-judicial statement cannot violate the defendant's right to confrontation when the extra-judicial declarant testifies and is cross-examined at trial,[36] constitutional difficulties can arise when, as happened here, an effort is made by the government to introduce the extra-judicial statements without the declarant being present at trial. In these circumstances the trial court must, despite the fact that it may have already determined that the extra-judicial statement falls within an exception to the hearsay rule, specifically determine, prior to deciding whether to admit the statement, that its introduction would not violate the confrontation clause. To be considered for admission the statement must bear sufficient indicia of reliability to assure an adequate basis for evaluating the truth of the declaration, for its truth will not be tested by adversary cross-examination at trial. *United States v. Puco, supra* at 1103, 1105; *id.* at 1107 (opinion on petition for rehearing).[37]

*United States v. Puco, supra* at 1104 n.8, seems to suggest that a possible consideration in determining whether an extra-judicial statement sought to be introduced is sufficiently trustworthy to be admitted over an objection that it violates the confrontation clause is the possibility that cross-examination at trial might weaken the reliability of the statement. In the instant case it arguably might have. Appellant would certainly have wanted to explore the question of the absence of Weinberg's signature on the copy of the official report originally handed to the defense. So, too, the appellant would have sought to learn when, why and by whom the deletion on Exhibit 12 was made without a corresponding deletion having been made on the chemist's worksheet. In addition to these questions unique to this case, appellant might also have explored Weinberg's per-

322 A.2d 653, 657 n.6 (1974); Advisory Committee's Notes, Note to Rule 806, 56 F.R.D. at 329. Thus, for confrontation clause purposes, it was Weinberg, and not Mrs. Harrington, who was the witness against appellant here. We have recognized the historical purpose of the confrontation clause:

> "The primary object of the constitutional provision in question was to prevent depositions or *ex parte* affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief."

*United States v. Bell, supra* at 670–71, quoting *Mattox v. United States,* 156 U.S. 237, 242–43, 15 S.Ct. 337, 39 L.Ed. 409 (1895).

**35.** *Accord, e.g., Stewart v. Cowan,* 528 F.2d 79, 87 (6th Cir. 1976); *Phillips v. Neil, supra* at 345; *United States v. Lipscomb,* 435 F.2d 795, 802 (5th Cir. 1970), *cert. denied,* 401 U.S. 980, 91 S.Ct. 1213, 28 L.Ed.2d 331 (1971); *Henson v. State,* —— Del. ——, 332 A.2d 773, 775 (1975);

*State v. Larochelle,* 112 N.H. 392, 397, 297 A.2d 223, 226 (1972); 5 Wigmore, Evidence § 1397, at 184 (Chadbourn rev. 1974); Advisory Committee's Notes, Introductory Note to Article VIII, 56 F.R.D. at 292.

**36.** *California v. Green,* 399 U.S. 149, 162, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); *id.* at 172, 90 S.Ct. 1930 (Harlan, *J.,* concurring); *Phillips v. Neil, supra* at 346; *United States v. Weber,* 437 F.2d 327, 339 nn.12&13 (3d Cir. 1970), *cert. denied,* 402 U.S. 932, 91 S.Ct. 1524, 28 L.Ed.2d 867 (1971); *State v. Larochelle, supra* at 399, 297 A.2d at 228 (dissenting opinion); *State v. Tims, supra* at 139, 224 N.E.2d at 351; *Commonwealth v. McCloud, supra* at 316, 322 A.2d at 657.

**37.** *E.g., Mancusi v. Stubbs,* 408 U.S. 204, 213, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972); *Stewart v. Cowan, supra* at 85; *United States v. Yates, supra,* 524 F.2d at 1286 n.10; *Park v. Huff,* 493 F.2d 923, 930–31 (5th Cir. 1974), *rev'd on rehearing en banc,* 506 F.2d 849 (5th Cir. 1975) (over dissent of six judges); *United States v. Lipscomb, supra* at 802–03; *State v. Larochelle, supra* at 396, 297 A.2d at 226; *see e.g., Henson v. State, supra,* 332 A.2d at 775.

sonal qualifications and experience, see, e.g., Phillips v. Neil, 452 F.2d 337, 347 (6th Cir. 1971), cert. denied, 409 U.S. 884, 93 S.Ct. 96, 34 L.Ed.2d 141 (1972); State v. Tims, 9 Ohio St.2d 136, 138, 224 N.E.2d 348, 351 (1967); Commonwealth v. McCloud, 457 Pa. 310, 314, 315–16 n.6, 322 A.2d 653, 656, 657 n.6 (1974), and attempted to ascertain from Weinberg, the actual witness against appellant, whether the tests Weinberg performed here, which were not "mere routine recordation[s] of facts," State v. Larochelle, supra at 400, 297 A.2d at 228 (dissenting opinion), were correctly performed, see State v. Tims, supra at 138, 224 N.E. 2d at 351; Commonwealth v. McCloud, supra at 315–16 n.6, 322 A.2d at 657 n.6; accord, State v. Larochelle, supra at 400–01, 297 A.2d at 228–29 (dissenting opinion),

whether the procedures and analyses used are recognized in the profession as being reliable, and, if so, how reliable, see State v. Larochelle, supra at 400, 297 A.2d at 228 (dissenting opinion), and whether any machines used were in good working order, see id.[38]

Beyond the necessary demonstration that the extra-judicial statement is trustworthy, there arises a real question, which this case would present, whether the prosecutor bears the additional burden of producing all available declarants upon whose extra-judicial declarations the government intends to rely, or, in the alternative, showing the unavailability of these declarants.[39] Our decision in United States v. Puco, supra, indicates that when the extra-judicial statement is not crucial to the government's case

**38.** It should also be mentioned that it is possible that an extra-judicial statement might qualify as a business record under FRE 803(6) though failing to possess sufficient indicia of reliability to pass confrontation analysis. Specifically, the extra-judicial statement, assuming compliance with the principal requirements of FRE 803(6), qualifies as a business record "unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness." As explained earlier in this opinion, the burden would thus seem to be on the party opposing admission. On the other hand, if there is a burden in the confrontation analysis, the language of the cases apparently imposes that burden on the party favoring admission of the statement, i.e., the government. Because of the reversal of burdens, any inability of appellant to prove that the chemist's report and worksheet are not sufficiently untrustworthy to be excluded from the business records exception does not automatically mean that those documents are sufficiently trustworthy to be admitted over an objection asserting a denial of the right to confrontation.

**39.** A persuasive argument in support of requiring the prosecution to call an extra-judicial declarant whose statement the government intends to introduce at trial is that by not calling such a witness the prosecutor is, in effect, shielding the witness' testimony from cross-examination, see, e.g., Park v. Huff, 493 F.2d 923, 933–34 (5th Cir. 1974), rev'd on rehearing en banc, 506 F.2d 849 (5th Cir.) (over dissent of six judges), cert. denied, 423 U.S. 824, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975); Phillips v. Neil, supra at 347; Commonwealth v. McCloud, supra at 314, 322 A.2d at 656; State v. Miller, supra at 105, 326 N.E.2d at 262; State v. Tims, supra at 138, 224 N.E.2d at 351, and it has also been argued that the disadvantage the defendant

suffers because of the prosecutor's failure to call the extra-judicial declarant is not ameliorated by the defendant's ability to call the extra-judicial declarant as his own witness. See, e.g., Park v. Huff, 493 F.2d 923, 934–35 (5th Cir. 1974), rev'd on rehearing en banc, 506 F.2d 849 (5th Cir.) (over dissent of six judges), cert. denied, 423 U.S. 824, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975); Phillips v. Neil, supra at 348; Simmons v. United States, 440 F.2d 890, 891 (7th Cir. 1971); Hoover v. Beto, 439 F.2d 913, 924 (5th Cir. 1971), rev'd on rehearing en banc, 467 F.2d 516 (5th Cir.) (over dissent of seven judges), cert. denied, 409 U.S. 1086, 93 S.Ct. 703, 34 L.Ed.2d 673 (1972); State v. Larochelle, supra at 401, 297 A.2d at 229 (dissenting opinion); The Supreme Court, 1970 Term, 85 Harv.L.Rev. 3, 195 (1971); cf. New York Life Ins. Co. v. Taylor, 79 U.S.App.D.C. 70, 147 F.2d 301, 305 (D.C.Cir. 1945), aff'g on rehearing, 79 U.S.App. D.C. 66, 147 F.2d 297 (D.C.Cir. 1944). While Rules 607 and 611 of the new Federal Rules of Evidence, by allowing a party to lead and impeach his own witness, may have removed some of the former disadvantage suffered by a defendant, part of the detriment, well explicated in Phillips v. Neil, supra at 348 and The Supreme Court, 1970 Term, 85 Harv.L.Rev. 3, 195 (1971), remains. In any event, the right of confrontation is broader than the right to cross-examination, see, e.g., Hoover v. Beto, 467 F.2d 516, 561 (5th Cir.) (Rives, J., with whom six other judges join, dissenting), cert. denied, 409 U.S. 1086, 93 S.Ct. 703, 34 L.Ed.2d 673 (1972), and it is the prosecutor who should have the burden of producing witnesses against the defendant, see id. at 560; State v. Larochelle, supra at 401, 297 A.2d at 229 (dissenting opinion).

or is not devastating to the defense, a showing by the government that the declarant is unavailable is not a prerequisite to introduction of the statement. However, we also found in *Puco* that the "scope [of the holding of *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970)] is uncertain in view of both the facts of the case and other recent decisions," *id.* at 1103, and, indeed, there is reason to believe that after *Mancusi v. Stubbs,* 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972); *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); *Barber v. Page,* 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); and *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), the government does bear the burden of producing extra-judicial declarants,[40] or of demonstrating their genuine unavailability whenever the extra-judicial statements being offered at trial are crucial to the government's case.[41] *Puco* did not have to resolve this question, *see* 476 F.2d at 1103 n.6, because the extra-judicial statement there was not crucial to the government's case, but was merely cumulative to admissible evidence. In dissenting from the denial of the petition for rehearing in *Puco,* however, Judge Lumbard, while arguing that *Dutton v. Evans, supra,* was totally inapposite when the extra-judicial statement qualified under the co-conspirators exception to the hearsay rule, did find it "hard to understand" how cruciality could not be relevant, if, in fact, *Dutton* is correctly applied to determine whether the government's introduction of the extra-judicial statement, though permissible under an exception to the hearsay rule, might nonetheless violate the confrontation clause. *Id.* at 1110; *see United*

*States v. Masullo,* 489 F.2d 217, 224–25 (2d Cir. 1973).

Of course, if cruciality is relevant, here the chemist's report and worksheet, unlike the hearsay statements in *Puco* and *Dutton,* were crucial. The purpose for which they were offered was to prove an essential element of the government's case, *see, e.g., Stewart v. Cowan,* 528 F.2d 79, 80, 83, 85 (6th Cir. 1976); *State v. Wiley,* 295 Minn. 411, 421, 205 N.W.2d 667, 675 (1973); *State v. Matousek,* 287 Minn. 344, 350, 178 N.W.2d 604, 608 (1970); *State v. Tims, supra* at 139, 224 N.E.2d at 351; *Commonwealth v. McCloud, supra* at 314–15, 322 A.2d at 656–57, and, as to that element, none of the other evidence in the case could have sufficed. *See United States v. Puco, supra* at 1104.

Here the hearsay evidence was crucial. So, assuming that this cruciality triggers the requirement that before offering the extra-judicial statement the government must either produce the extra-judicial declarant or show his unavailability, there surely is some doubt whether the Assistant United States Attorney made a satisfactory showing of the declarant's unavailability. The unexplained failure to speak with the prospective witness personally, the prosecutor's personal ignorance of the precise nature and expected duration of the witness's condition, and the complete failure to produce some proof of the witness's physical inability to testify raise quite serious doubts as to whether such a sufficient showing was indeed made.

These serious questions of constitutional dimension reinforce our belief that we are correct in holding, as we hold

---

**40.** *State v. Wiley, supra* at 420–21, 205 N.W.2d at 674–75.

**41.** *Stewart v. Cowan, supra* at 84; *Hoover v. Beto,* 467 F.2d at 551, 552–54, 556, 556–57 & n.27 (Rives, *J.,* with whom six other judges join, dissenting); *Phillips v. Neil, supra* at 347–48; *Simmons v. United States,* 440 F.2d at 891; *United States v. Weber, supra* at 338; *Henson v. State, supra,* 332 A.2d at 775; *Commonwealth v. McCloud, supra,* at 314–17, 322 A.2d at 656–57; Davenport, The Confrontation Clause and the Co-conspirator Exception in Criminal Prosecutions: A Functional Analysis,

85 Harv.L.Rev. 1378, 1403 (1972); The Supreme Court, 1970 Term, 85 Harv.L.Rev. 3, 194–96 (1971); *see California v. Green, supra,* 399 U.S. at 174, 90 S.Ct. 1930 (Harlan, *J.,* concurring); *Dutton v. Evans,* 400 U.S. 74, 95–96, 91 S.Ct. 210, 223, 27 L.Ed.2d 213 (1970) (Harlan, *J.,* concurring) ("A rule requiring production of available witnesses would significantly curtail development of the law of evidence to eliminate the necessity for production of declarants where production would be unduly inconvenient *and of small utility to a defendant.*") (emphasis supplied).

here, that in criminal cases reports of public agencies setting forth matters observed by police officers and other law enforcement personnel and reports of public agencies setting forth factual findings resulting from investigations made pursuant to authority granted by law cannot satisfy the standards of any hearsay exception if those reports are sought to be introduced against the accused. Inasmuch as the chemist's documents here can be characterized as governmental reports which set forth matters observed by law enforcement personnel or which set forth factual findings resulting from an authorized investigation, they were incapable of qualifying under any of the exceptions to the hearsay rule specified in FRE 803 and 804. The documents were crucial to the government's case, they were, of course, hearsay, and, inasmuch as they were ineligible to qualify for any exception to the hearsay rule, their admission at trial against appellant was prejudicial error.

### III

In summary, then, we hold that the motion to suppress was properly denied. We further hold, however, that the introduction of the chemist's documents constituted reversible error and, accordingly, we reverse the judgment of conviction and remand for a new trial.